**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
     *Plaintiff-Appellee,*

v.

DONALD E. FAULKNER,
     *Defendant-Appellant.*

No. 05-10405

D.C. No.
CR-04-05077-REC

OPINION

Appeal from the United States District Court
for the Eastern District of California
Robert E. Coyle, Senior Judge, Presiding

Argued and Submitted
February 16, 2006—San Francisco, California

Filed June 13, 2006

Before: Stephen Reinhardt, Richard A. Paez, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman;
Concurrence by Judge Reinhardt

**COUNSEL**

Mark A. Lizarraga, Assistant Federal Public Defender, Fresno, California, for the defendant-appellant.

Stanley A. Boone, Assistant United States Attorney, Fresno, California, for the plaintiff-appellee.

## OPINION

TALLMAN, Circuit Judge:

Donald E. Faulkner ("Faulkner") appeals the district court's denial of his motion to suppress evidence. Faulkner was cited for driving while his license was suspended and for driving in possession of an open container of alcohol. During a stop at an information station operated by the Bureau of Land Management ("BLM") located on federal land in California, Chief Ranger Ed Ruth ("Ruth") observed a one quart, open-container of beer in Faulkner's car. During the stop, Ruth learned that Faulkner's driver's license was suspended. We must decide in this case whether the brief stop of Faulkner at the checkpoint[1] was a valid seizure under the Fourth Amendment. We conclude that it was and affirm.

## I

The following facts are drawn from the evidence presented at the suppression hearing before the district court and on the court's factual findings in support of its ruling.

In the summer of 2001, Ruth established an information station on federal land approximately 165 feet after entering the BLM's[2] Paradise Recreation Area ("Paradise") in Three

---

[1]While we recognize that the term "checkpoint" is a noun laden with legal significance and we look to the Supreme Court's jurisprudence that analyzes police seizures during this type of activity, because the facts here are unique and quite different from related cases analyzing the constitutionality of a police checkpoint, we will refer to the activities of Chief Ranger Ed Ruth as having erected an "information station" for the sake of clarity and to more accurately explain the rationale for our decision.

[2]The BLM is an agency of the United States Department of the Interior.

Rivers, California. Ruth, the Chief Ranger for the BLM in Bakersfield responsible for managing the BLM's law enforcement program, personally staffed the information station 98 to 99 percent of the time. The information station consisted of orange cones, a stop sign, a uniformed ranger, and an official ranger vehicle with a light bar and siren parked adjacent to the roadway. There was sufficient space on the Paradise approach road for a vehicle to turn around before reaching the information station, as several drivers had successfully done in the past.

Ruth stopped every vehicle for approximately 20 seconds to inform the occupants of newly promulgated regulations governing the use and enjoyment of Paradise and to provide them with a litter bag. A list of the regulations governing activity at Paradise was printed on the litter bag. Among other things, the BLM regulations prohibited campfires and the possession of alcoholic beverages, and required all litter to be placed in a container. The BLM spent $2,500 to purchase 5,000 preprinted litter bags in advance of this activity.

Ruth established the information station to "provide information to visitors to the recreation area of the regulations governing its use." This was partly in response to prior complaints about intoxicated motorists, increased litter, illegal fires, underage consumption of alcohol and controlled substances, and gang activity. Ruth had determined that visitors were not reading the informational bulletin boards erected within Paradise that listed prohibited conduct. Ruth concluded that with only two other law enforcement employees for his entire district, no reasonable alternative existed to notify the visitors, since Ruth and his small staff could not visit each campsite or adequately patrol three different recreation areas, the roadways, and the beaches adjacent to the rivers.

At the information station, Ruth sometimes asked visitors if they possessed alcohol. If the occupants responded in the affirmative, he would permit them to leave the area or drop

off the alcohol with him and retrieve it upon leaving. Ruth testified that he had previously issued citations for possessing alcohol on "only one or two occasions"—for being a minor in possession of alcohol. He sometimes asked visitors to open a cooler to show that they were not bringing alcohol onto federal land.

At approximately 4:00 p.m. on June 1, 2003, Ruth stopped Faulkner and his wife at the information station. When Ruth approached the vehicle he immediately noticed in plain view a one quart, open-container of beer. Ruth retrieved the alcohol and ordered Faulkner to pull off the road and produce a valid driver's license. Faulkner then informed Ruth that he did not have a license and a subsequent check revealed that his license had been suspended since October 30, 2002. During a "cursory visual search" of the vehicle's interior for additional open containers of alcohol, Ruth observed some marijuana and smoking paraphernalia. Ruth cited Faulkner under the Assimilative Crimes Act, 18 U.S.C. § 13, and implementing federal regulations for driving while his license was suspended, in violation of 43 C.F.R. § 8341.1(d) and California Vehicle Code § 14601.1(a), and for driving in possession of an open container of alcohol, in violation of 43 C.F.R. § 8341.1(d) and California Vehicle Code § 23223(a). Faulkner filed a motion to suppress the evidence. After an evidentiary hearing, the district court denied Faulkner's motion, ruling that the stop at the information station was constitutional because its primary purpose was to "provide information to visitors to the recreation area of the regulations governing its use . . . ." Faulkner and the government then entered into a conditional plea agreement pursuant to Rule 11(c) of the Federal Rules of Criminal Procedure, whereby Faulkner pled guilty but reserved the right to appeal the denial of his motion to suppress. On March 16, 2005, Faulkner was sentenced to one year of probation. This timely appeal followed.

## II

### A

A district court's denial of a motion to suppress evidence is reviewed de novo. *United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004). The factual findings underlying the denial of the motion are reviewed for clear error. *Id.*

### B

**[1]** " '[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person . . . .' " *Brown v. Texas*, 443 U.S. 47, 50 (1979) (internal citation omitted) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)). The Supreme Court has been clear that although not every encounter between a police officer and a citizen is a seizure, *United States v. Mendenhall*, 446 U.S. 544, 553, 554 (1980); *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976); *Sibron v. New York*, 392 U.S. 40, 61 (1968), "the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). But "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* at 19 n.16. Indeed, the Supreme Court has "conclude[d] that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554.

**[2]** Chief Ranger Ruth was a commissioned federal law enforcement officer; he was uniformed, armed with a firearm, and entrusted with an official government vehicle with a siren and light bar that was parked nearby. *Cf. id.* at 555 ("On the facts of this case, no 'seizure' of the respondent occurred. . . .

The agents wore no uniforms and displayed no weapons. They did not summon the respondent to their presence, but instead approached her . . . . They requested, but did not demand to see the respondent's identification . . . ."). While imparting campground use rules to recreation area visitors, he also had the authority to enforce the law and make arrests. Ruth, "by show of authority," erected a station with orange cones, a stop sign, and his official government vehicle to restrain Faulkner's liberty. Indeed, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave" the information station. *See id.* at 554. Ruth established the information station with a show of authority to restrain for 20 seconds the liberty of each motorist entering Paradise. *See Illinois v. Lidster*, 540 U.S. 419 (2004) (ruling that a police checkpoint established for the purpose of stopping motorists for 10-15 seconds to distribute a flyer and "ask them for information about a recent hit-and-run accident" is a seizure). Thus, Chief Ranger Ruth "seized" Faulkner within the meaning of the Fourth Amendment and we apply Fourth Amendment jurisprudence to examine whether this seizure without a warrant was constitutional.

## C

**[3]** There are two steps we must take in determining whether the stop at the information station is constitutional. First, we must determine whether the primary purpose of the information station was to advance "the general interest in crime control." *City of Indianapolis v. Edmond*, 531 U.S. 32, 48 (2000). If so, then the stop at the information station is per se invalid under the Fourth Amendment. If not, then we must determine whether the stop at the information station was a reasonable seizure. *Brown*, 443 U.S. at 50.

## D

The district court found that the "primary purpose of the information station was . . . to provide information to visitors

to the recreation area of the regulations governing its use, which include but are not limited to the possession or consumption of alcohol." This finding is reviewed for clear error. *Bynum*, 362 F.3d at 578. We are satisfied upon review of the facts adduced during the hearing that this finding was not clearly erroneous.

**[4]** The litter bag itself is clear evidence that the primary purpose of the information station was not to advance the general interest in crime control. The preprinted rules on the litter bag, which include regulations concerning campfires for fire safety, refuse disposal for litter control, and camping restrictions in a day use recreation area, are further evidence of a premeditated regulatory purpose other than advancing the general interest in crime control. Indeed, Chief Ranger Ruth testified that an important concern during the summer season was the prevention of illegal fires and the promotion of fire safety. In *Lidster*, the Supreme Court took note of the fact that the police distributed a flyer, *Lidster*, 540 U.S. at 422, when holding constitutional "a highway checkpoint where police stopped motorists to ask them for information about a recent hit-and-run accident," *id.* at 421. Here, it is equally worthy of note that the BLM spent $2,500 to distribute litter bags to each visitor upon entry. Furthermore, just as in *Lidster*, the fact that Ruth ultimately arrested Faulkner as a result of what he saw in Faulkner's vehicle does not establish that the primary purpose of the stop was to advance the general interest in crime control.

The nomenclature is also probative of the activity's purpose. Throughout the course of its existence, Ruth repeatedly referred to the activity as a "mobile visitor's station," a "mobile information station," and an "information station." Instead of indicating a general interest in crime control, the name appropriately describes a visitors' information station typical of that found at the entrance to many federal parks. This inference is also supported by Ruth's testimony that he

would use the station as an opportunity to "answer [visitors'] questions."

**[5]** Faulkner, however, argues that "the primary purpose of the 'mobile visitor's station' was to detect evidence of ordinary criminal wrongdoing" because the information station was erected partly in response to complaints of criminal activity and because Ruth sometimes asked visitors for consent to inspect coolers for alcohol. This analysis, however, is not sufficient to invoke *Edmond's* application. First, *Edmond* does not apply unless the *primary* purpose of a checkpoint stop is to advance the general interest in crime control. *Edmond*, 531 U.S. at 48. While one of the information station's purposes may have been to advance a general interest in crime control, it was not the *primary* purpose. Indeed, "the phrase 'general interest in crime control' does not refer to every 'law enforcement' objective." *Lidster*, 540 U.S. at 424 (citing *Edmond*, 531 U.S. at 44 & n.1). Considering the BLM's purchase of 5,000 litter bags with park regulations printed on each bag, the district court could certainly conclude that the primary purpose of the information station was "to provide information to visitors to the recreation area of the regulations governing its use . . . ."

**[6]** Second, *Edmond* does not apply because the curtailment of littering, illegal fires, and driving while intoxicated serves a purpose beyond the general interest in crime control. One of the primary reasons for prohibiting possession of alcohol was because "[a]bout 70 percent of the volume of litter was beer bottles." Indeed, the litter problem had become so severe that trash was "floating in the river along residential areas" and "common complaints involved used baby diapers being dumped in the river." Moreover, "[r]angers also became aware of the visitors' high disregard for fire safety regulations." The curtailment of these activities ensured visitors' safety and protected the resource to preserve the continuing beauty of the natural habitat so that others may enjoy these areas.

**[7]** The district court found, as a matter of fact, that the primary purpose of the activity was to distribute litter bags, promote fire safety, curtail drinking and driving, and provide information to visitors regarding the new regulations. The district court correctly found that the primary purpose was not to advance the general interest in crime control, but to protect the use and enjoyment of the recreation area. Although Ruth was able to observe an open container of alcohol in Faulkner's vehicle as an incident to the stop, that fact does not undermine the district court's finding that the primary purpose was to provide information to park visitors. The factual findings underlying the denial of the motion to suppress with respect to the *Edmond* analysis were not clearly erroneous and the information station must be evaluated for its reasonableness under the balancing test developed in *Brown v. Texas*. *See id.* at 426.

**E**

**[8]** " '[T]he Fourth Amendment requires that . . . seizure[s] be 'reasonable.' " *Brown*, 443 U.S. at 50 (internal citation omitted) (quoting *Brignoni-Ponce*, 422 U.S. at 878). The reasonableness of a seizure is determined by weighing "[(1)] the gravity of the public concerns served by the seizure, [(2)] the degree to which the seizure advances the public interest, and [(3)] the severity of the interference with individual liberty." *Id.* at 51 (citing *Brignoni-Ponce*, 422 U.S. at 878-83). The Court advises that "[a] central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 654-55 (1979); *Brignoni-Ponce*, 422 U.S. at 882).

**[9]** The public concern served by this seizure can be described generally as the need to provide information to people entering Paradise in order to ensure that all visitors will

be safe and welcomed, and will continue to visit and make use of these protected areas. But it can also be described more specifically as the need to prevent litter, promote fire safety, reduce incidents of driving under the influence, eliminate property destruction and gang activity, and protect the environment.

In *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990), the Supreme Court discussed in broad terms the gravity of the public concerns served by a highway sobriety checkpoint. *Id.* at 449-51. Although the only highway sobriety checkpoint established was limited to a 75-minute existence in Saginaw County, *id.* at 448, the Court measured the gravity of public concerns—death, injury, and property damage—by the nationwide effects of drunk driving. *Id.* at 451. Here, the gravity of the less localized public concerns, such as litter and illegal fires in federal parkland, should also be measured by their nationwide impact.

[10] While the gravity of the public concerns served by this information station may not be as severe as those raised in *Sitz*, they are no less grave than the public concerns served by the entrance stations at Yosemite National Park, Joshua Tree National Park, Mt. Rainier National Park, or any other national park. Moreover, the concerns at issue here were raised directly by the public and have received the attention of the media. *Cf. id.* (noting the high incidence of media reports covering alcohol-related deaths on state highways). Thus, the gravity of the public interest served by the information station is high.

In *Lidster*, the Court measured the degree to which the seizure advanced the public interest by the relationship of the checkpoint to its objective, rather than by any measurable results, or by any results period. The Court stated:

> The stop advanced this grave public concern to a significant degree. The police appropriately tailored

their checkpoint stops to fit important criminal investigatory needs. The stops took place about one week after the hit-and-run accident, on the same highway near the location of the accident, and at about the same time of the night. And police used the stops to obtain information from drivers, some of whom might well have been in the vicinity of the crime at the time it occurred.

540 U.S. at 427.

Furthermore, when the Supreme Court has examined measurable data to determine the degree to which a seizure advances the public interest, it has tolerated a very low level of productivity. The Court, for example, found sufficient the degree to which a seizure advanced the public interest where a sobriety checkpoint resulted in only 1.6 percent of drivers being arrested for alcohol impairment, *Sitz*, 496 U.S. at 454-55, and a checkpoint search for illegal aliens where only 0.12 percent of the vehicles stopped were found to be transporting illegal aliens, *Martinez-Fuerte*, 428 U.S. at 554.

Here, many of the BLM's objectives—increasing fire safety, enhancing environmental protection, reducing litter, and eliminating drug sales and use—are important if not readily observable. And although it is unclear from the record how many cars had passed through the information station, it is clear that Ruth distributed the litter bag and communicated the new BLM rules to 100 percent of the cars that entered Paradise when the information station was in operation. It is also clear that Ruth cited one or two individuals for being minors in possession of alcohol and prevented many others from entering Paradise with alcohol, which was the source of 70 percent of the litter. Although he had no way to measure the total volume of litter, Chief Ranger Ruth testified that "there was a reduction at least in broken glass." Thus, "[t]he [information station] advanced this grave public concern to a significant degree." *Lidster*, 540 U.S. at 427.

The severity of the interference with individual liberty must be gauged by the " 'objective' intrusion, measured by the duration of the seizure and the intensity of the investigation," and by the " 'subjective' intrusion," measured by the "fear and surprise engendered in law-abiding motorists by the nature of the stop." *Sitz*, 496 U.S. at 452. In *Lidster*, the Court ruled that "[m]ost importantly, the stops interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect" where a checkpoint "required only a brief wait in line" and "[c]ontact with the police lasted only a few seconds." 540 U.S. at 427. Indeed, contact with police in *Lidster* lasted 10-15 seconds, *id.* at 422, while the Court upheld police contact of 25 seconds in *Sitz*, 496 U.S. at 448, and three-to-five minutes in *Martinez-Fuerte*, 428 U.S. at 547. Here, Ruth stopped each vehicle for only 20 seconds, "[u]nless they had questions."

**[11]** The Court has defined the severity of the subjective intrusion on individual liberty as measured by the amount of concern and fright that is generated on the part of lawful travelers. *Lidster*, 540 U.S. at 427-28; *Prouse*, 440 U.S. at 653-54, 657; *Martinez-Fuerte*, 428 U.S. at 558. The Court has clarified that "we view checkpoint stops in a different light [than other seizures] because the subjective intrusion[—]the generating of concern or even fright on the part of lawful travelers[—]is appreciably less in the case of a checkpoint stop." *Martinez-Fuerte*, 428 U.S. at 558. Indeed, the checkpoint stop is inherently of a less frightful nature than an ordinary seizure, such as a roving-patrol stop. *Id.* And while there were no warning signs, turnoffs, or written guidelines governing the checkpoint in *Lidster*, the Court ruled that "the contact [with police] provided little reason for anxiety or alarm. *The police stopped all vehicles systematically*." 540 U.S. at 428 (emphasis added). Leaving little room for doubt, the Court declared in *Prouse* that:

> For Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random

stops of individual vehicles making their way through city traffic and those stops occasioned by roadblocks where all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community. "At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion."

440 U.S. at 657 (quoting *United States v. Ortiz*, 422 U.S. 891, 894-95 (1975)). Here, Ruth stopped all vehicles, so there was no concern that a seizure might engender concern or fright on the part of visitors. Thus, based on the Court's measurement of nearly identical objective and subjective intrusions in other cases, the information station at issue here "interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect." *Lidster*, 540 U.S. at 427.

## III

**[12]** The primary purpose of the information station was not to advance the general interest in crime control, and the gravity of the public concerns served by the seizure and the degree to which the seizure advanced the public interest outweigh the minimal interference with individual liberty. Thus, Faulkner's Fourth Amendment rights have not been violated. The district court's decision denying Faulkner's motion to suppress evidence and his conditional conviction are AFFIRMED.

---

REINHARDT, Circuit Judge, concurring:

Although I agree with the majority's ultimate conclusion that the stop at the information station was constitutional, I do

so not because I believe that it was a reasonable seizure,[1] but because I believe it was not a seizure at all.

Chief Ranger Ruth stopped all cars entering Paradise Recreation Area to inform them of park regulations and to provide them with a litter bag. There was ample space on the road leading into the park for potential visitors to turn around, should they not wish to proceed to the information station. Although Ruth would occasionally ask visitors if they possessed alcohol, the majority acknowledges that an affirmative answer would not ordinarily be of any material consequence, as the possession of alcohol is not per se illegal.[2] At no point during their brief exchanges with Ruth would the freedom of potential visitors be terminated or restricted. *See Brower v. County of Inyo*, 489 U.S. 593, 597 (1989) (holding that a Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied" (emphasis omitted)); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (holding that "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person"). To the contrary, any visitor headed towards or stopped at the information station would "remain[ ] free to disregard the [information being provided] and walk away."

---

[1]Although I do not believe that the stop that the majority treats as a seizure constitutes a seizure as defined for purposes of the Fourth Amendment, I do believe that such a seizure occurred when Ruth directed Faulkner to pull over to the side of the road and to produce his driver's license after he observed an open container of beer in Faulkner's vehicle. The seizure that occurred at that time was reasonable. Thus, I concur that the district court's denial of the motion to suppress should be affirmed.

[2]If visitors did respond affirmatively regarding their possession of alcohol, Ruth "would permit them to leave the area or drop off the alcohol with him and retrieve it upon leaving." Maj. Op. at 6574-75. Although Ruth sometimes observed criminal activity — e.g., minors in possession of alcohol or possession of open containers of alcohol — the purpose of the information station was not to conduct law enforcement activities. Any such instances were merely incidental to the station's primary purposes. The record reveals that Ruth issued citations for such conduct on "only one or two occasions." *Id.*

*United States v. Arias-Villanueva*, 998 F.2d 1491, 1501 (9th Cir. 1993) (*citing United States v. Mendenhall*, 446 U.S. 544, 555 (1980)).

Because Ruth was merely providing drivers with information before allowing them to enter the park, he had no interest in stopping them to investigate any criminal activity; nor would he respond in any manner to drivers who chose not to enter the park. Moreover, his conduct gave no reason for drivers to believe that something was expected of them, other than to obey the park rules if they decided to proceed with their visit. *Compare Mendenhall*, 446 U.S. at 554-55 ("Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. . . . In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." (citations omitted)). In short, Smokey the Bear is not a fear-inducing figure.

Although the Supreme Court has held repeatedly that checkpoint stops constitute "seizures" for purposes of the Fourth Amendment, *see Illinois v. Lidster*, 540 U.S. 419, 425-26 (2004); *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000); *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990); *United States v. Martinez-Fuerte*, 428 U.S. 543, 556 (1976), in those cases — all of which are cited in the majority opinion — the purpose of the stop was always to *seek* information about criminal activity. *See Lidster*, 540 U.S. at 421 (upholding as constitutional a highway checkpoint at which police stopped motorists to seek information about a recent hit-and-run accident); *Edmond*, 531 U.S. at 34, 48 (holding that stops pursuant to a highway checkpoint program, the primary purpose of which was to discover and inter-

dict illegal narcotics, constituted unreasonable seizures); *Sitz*, 496 U.S. at 447 (upholding as constitutional highway sobriety checkpoints at which officers examined drivers for signs of intoxication); *Martinez-Fuerte*, 428 U.S. at 545 (upholding as constitutional a permanent border checkpoint of which the purpose was to check for transportation of illegal aliens). Thus, the stops were all law enforcement stops designed to further law enforcement purposes.

When officers are *seeking* information from drivers regarding criminal matters — it is understandable that the persons stopped may not feel free to drive away and that such stops may therefore constitute "seizures." *See Mendenhall*, 446 U.S. at 554. In the instant case, however, Ranger Ruth was not seeking information. Instead, the purpose was the exact opposite — to *provide* helpful information about the park and its regulations to potential park visitors. Indeed, as the district court found, Ruth was not performing a law enforcement stop. *Cf. United States v. Attson*, 900 F.2d 1427, 1430-31 (9th Cir. 1990) (holding that "governmental conduct that is not actuated by an investigative or administrative purpose [designed to elicit a benefit for the government] will not be considered a 'search' or 'seizure' for purposes of the Fourth Amendment" and noting that the Supreme Court has only rarely applied the Fourth Amendment to "noncriminal noninvestigatory governmental conduct" (emphasis omitted)).

The encounter experienced by drivers at the information station is voluntary, consensual and accepted as part of the ordinary process of entering Paradise Recreation Area. *See Arias-Villanueva*, 998 F.2d at 1501 (holding that a consensual encounter did not constitute a seizure); *compare Lidster*, 540 U.S. at 425-26 (characterizing the checkpoint stop at issue as involuntary); *Edmond*, 531 U.S. at 40 (same). Because the stops at the park entrance do not constrain the liberty of potential Paradise visitors in any way, and because their purpose is not to elicit information for the government in either its investigative or administrative capacities, I conclude that

they do not constitute seizures for purposes of the Fourth Amendment. Accordingly, I would hold that the Fourth Amendment does not apply here and would affirm on that basis.