# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

RICARDO FRAIRE,
*Defendant-Appellant.*

No. 08-10448

D.C. No.
1:08-MJ-00006-
SMS

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted
July 14, 2009—San Francisco, California

Filed August 4, 2009

Before: Barry G. Silverman, Richard R. Clifton and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Silverman

## COUNSEL

Daniel J. Broderick, Federal Defender, Douglas J. Beevers, Assistant Federal Defender (argued), Fresno, California, for the appellant.

Larry G. Brown, Acting United States Attorney, Mark J. McKeon, Assistant United States Attorney (argued), Fresno, California, for the appellee.

## OPINION

SILVERMAN, Circuit Judge:

Park rangers set up a vehicle checkpoint at the entrance to the Kings Canyon National Park to "mitigate the illegal taking of animals in the park" due to hunting, which is prohibited in the park. All vehicles were stopped for about 15 to 25 seconds, and their drivers asked about hunting. When Appellant Ricardo Fraire's vehicle was stopped at the checkpoint, a ranger noted a strong odor of alcohol on Fraire's breath. He subsequently was charged with driving under the influence and related offenses. In a motion to suppress, Fraire argued that the suspicionless stop of his vehicle was unconstitutional. We agree with the district court that it was not. We hold today that a momentary checkpoint stop of all vehicles at the entrance of a national park, aimed at preventing illegal hunting — which is minimally intrusive, justified by a legitimate concern for the preservation of park wildlife and the prevention of irreparable harm, directly related to the operation of the park, and confined to the park gate where visitors would expect to briefly stop — is reasonable under the Fourth Amendment.

## I.    Factual and Procedural Background

The facts pertinent to this appeal are drawn primarily from the testimony of Park Ranger David Schifsky, who testified at an evidentiary hearing about the background and operation of the checkpoint at issue in this case.

According to Schifsky, rangers at the Sequoia & Kings Canyon National Park instituted a vehicle checkpoint in 2007

to "mitigate the illegal taking of animals in the park." Hunting in the park is illegal. The checkpoint was implemented near one of the multiple park entrances and stopped all vehicles entering and exiting the park at that point. Rangers posted signs prior to the checkpoint instructing drivers to prepare to stop, concluding with stop signs, a cone pattern, a ranger station, and a ranger in a reflective jacket directing traffic. All rangers participating in the checkpoint were uniformed.

After a vehicle was stopped at the checkpoint, a ranger would approach the vehicle, identify himself or herself as a park ranger, state that he or she was conducting a hunting checkpoint, and then ask the driver, "have you been hunting" or "are you hunting?" If the driver responded that he or she was not hunting, the ranger would not search the vehicle's trunk. Questioning the drivers typically lasted about 15 to 25 seconds, and drivers sometimes had to wait in line for about one minute before being questioned by a ranger.

On October 13, 2007, Fraire was stopped at the checkpoint. Ranger Ernesto Felix approached Fraire's vehicle, smelled the odor of alcohol, and observed that Fraire's eyes were "bloodshot and glassy." Felix asked Fraire if he had been hunting and Fraire stated that he had not. Felix then asked Fraire if he had been drinking and Fraire stated that he had a couple of beers about an hour or two beforehand. Felix then conducted field sobriety tests on Fraire, which identified ten signs of intoxication. Fraire consented to a search of his vehicle, whereupon Felix found several open alcohol containers in the rear passenger compartment just behind the driver's seat.

Fraire was charged by information with operating a vehicle under the influence of alcohol, driving while under the influence of alcohol with a blood alcohol content in excess of .08, and possession of an open container of alcohol in a motor vehicle. *See* 36 C.F.R. §§ 4.23(a)(1), 4.23(a)(2), 4.14(b). After conducting the evidentiary hearing, the magistrate judge rendered an oral ruling denying Fraire's motion to suppress.

Fraire appealed the ruling to the district court, which affirmed the magistrate judge.

## II.  Standard of Review

A district court's denial of a motion to suppress evidence is reviewed de novo. *United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004). "Factual findings underlying the denial of the motion are reviewed for clear error." *Id*.

## III.  Analysis

**[1]** The Fourth Amendment prohibits "unreasonable searches and seizures." Here, Fraire endured a "seizure" when his vehicle was forced to stop at the checkpoint. *See United States v. Faulkner*, 450 F.3d 466, 469-70 (9th Cir. 2006).

**[2]** "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (citing *Chandler v. Miller*, 520 U.S. 305, 308 (1997)). The Supreme Court has recognized limited circumstances in which suspicion is not required, such as where a program is designed to serve "special needs, beyond the normal need for law enforcement." *Id*. The Court has upheld suspicionless seizures in two vehicle checkpoint cases. *Id*.

**[3]** There is a two-step analysis applicable to Fourth Amendment checkpoint cases. First, the court must "determine whether the primary purpose of the [checkpoint] was to advance 'the general interest in crime control.' " *See Faulkner*, 450 F.3d at 470 (quoting *Edmond*, 531 U.S. at 48). "If so, then the stop . . . is per se invalid under the Fourth Amendment." *Id*.; *see also Illinois v. Lidster*, 540 U.S. 419, 426 (2004) (describing this as the "presumptive rule of unconstitutionality").

**[4]** If the checkpoint is not per se invalid as a crime control device, then the court must "judge [the checkpoint's] reason-

ableness, hence, its constitutionality, on the basis of the individual circumstances." *Lidster*, 540 U.S. at 426. This requires consideration of "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* at 427 (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)); *see also Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 450-55 (1990) (balancing these factors in determining the reasonableness of a checkpoint stop); *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976) (same).

We first address whether the checkpoint was unconstitutional as a general crime control device. *In Edmond*, the city of Indianapolis operated vehicle checkpoints on city streets in an effort to discover and interdict illegal drugs. 531 U.S. at 34. The Court held that the checkpoint program violated the Fourth Amendment because the "primary purpose" was to "uncover evidence of ordinary criminal wrongdoing." *Id.* at 41-42. The Court distinguished two prior cases permitting checkpoints, *Martinez-Fuerte* and *Sitz*, on the grounds that the checkpoints in those cases served purposes other than ordinary crime control. *Id.* at 37-42. In *Martinez-Fuerte*, the Court upheld the constitutionality of an immigration checkpoint near the U.S.-Mexico border. 428 U.S. at 545. In *Sitz*, the Court upheld the constitutionality of a sobriety checkpoint that examined all drivers passing through for signs of intoxication. 496 U.S. at 447. *In Edmond*, the Court explained why the primary purpose of the checkpoints in *Martinez-Fuerte* and *Sitz* were not the detection of ordinary criminal wrongdoing. The Court acknowledged that "[s]ecuring the border and apprehending drunk drivers are, of course, law enforcement activities, and law enforcement officers employ arrests and criminal prosecutions in pursuit of these goals." 531 U.S. at 42. However, the checkpoint program in *Sitz* "was clearly aimed at reducing the immediate hazard posed by the presence of drunk drivers on the highways, and there was an obvious connection between the imperative of highway safety and the law enforcement practice at issue." *Id.* at 39; *see also id.*

at 43. As for *Martinez-Fuerte*, the objective there was to "intercept illegal aliens" and "to serve purposes closely related to the problems of policing the border[.]" *Id.* at 37, 41.

**[5]** We must now determine whether the checkpoint in this case is a general crime control device, as in *Edmond*, or whether it serves a different purpose, as in *Sitz* or *Martinez-Fuerte*. The district court found that the checkpoint's purposes included "catching violators, . . . deterrence, education and in turn wildlife protection." This finding is supported by Ranger Schifsky's testimony at the evidentiary hearing, who testified that the checkpoint was aimed at mitigating the effects of the illegal taking of animals in the park. That the checkpoint accomplished this goal through the use of law enforcement techniques does not automatically transform it into a crime control device for Fourth Amendment purposes. *See Edmond*, 531 U.S. at 42.

**[6]** The checkpoint in this case is analogous to the checkpoint upheld in Sitz and is distinguishable from the checkpoint in *Edmond*. A critical factor in *Sitz* was the close connection between the checkpoint and the harm it was seeking to prevent. *Id.* at 39 (describing the "obvious connection between the imperative of highway safety and the law enforcement practice at issue" in *Sitz*); *id.* at 43 (emphasizing the "close connection to roadway safety"). Likewise, here, the checkpoint was situated at an entrance to the park and sought to counter illegal hunting within that park. Unlike the drug crimes addressed by the *Edmond* checkpoint, which occur throughout the nation, the wildlife offenses here are specific to national parks. Further, just as the *Sitz* checkpoint prevented an immediate harm to motorists, the checkpoint here prevents hunters from destroying a precious natural resource. It does so by catching poachers before they can kill additional animals, by deterring would-be poachers, and by educating the park-going public about the hunting prohibition. The goal was prevention, not arrests.

**[7]** Because the primary purpose of the checkpoint is distinguishable from the general interest in crime control, the checkpoint is not per se unconstitutional under *Edmond*. We must therefore determine its "reasonableness, hence, its constitutionality, on the basis of the individual circumstances." *Lidster*, 540 U.S. at 426. Our first consideration is "the gravity of the public concerns served by the seizure[.]" *Id*. at 427 (quoting *Brown*, 443 U.S. at 51). In *Faulkner*, we described the gravity of the public concerns served by an informational checkpoint in a national park (preventing litter, promoting fire safety, reducing incidents of driving under the influence, eliminating property destruction and gang activity, and protecting the environment) as high. 450 F.3d at 472. Here, the public concerns, including the protection of wildlife and ensuring the safety of park visitors, are equally pressing.

**[8]** The second consideration is "the degree to which the seizure advances the public interest[.]" *Lidster*, 540 U.S. at 426 (quoting *Brown*, 443 U.S. at 51). Fraire contends that the checkpoint cannot be upheld without some empirical data demonstrating its effectiveness. He notes that the Court in *Sitz* relied on empirical data showing a 1.5% arrest rate in upholding that checkpoint. 496 U.S. at 454. The Court also contrasted *Delaware v. Prouse*, 440 U.S. 648 (1979), which held a program of suspicionless stops unconstitutional, where there was no empirical evidence of effectiveness. 496 U.S. at 454 (citing *Prouse*, 440 U.S. at 659-60). But there is nothing to suggest that the absence of empirical data was a dispositive factor in *Prouse*; rather, the lack of empirical data of effectiveness meant there was nothing to overcome the presumption of ineffectiveness derived from "common sense." *See Prouse*, 440 U.S. at 659-60 (stating that "common sense" suggested the "contribution to highway safety made by the discretionary stops" would be "marginal at best"); *id*. at 659 ("[A]bsent some empirical data to the contrary, it must be assumed that finding an unlicensed driver among those who commit traffic violations is a much more likely event than finding an unlicensed driver by choosing randomly from the

entire universe of drivers."). Here, common sense suggests the opposite — that the checkpoint would be a reasonably efficient tool at preventing poaching given the significant poaching problem and the targeted nature of the checkpoint. Finally, we have previously observed that in certain cases effectiveness may be measured "by the relationship of the checkpoint to its objective, rather than by any measureable results, or by any results period." *Faulkner*, 450 F.3d at 472-73.

**[9]** Here, Ranger Schifsky's testimony established there was a significant poaching problem within the park. The checkpoint was closely related to addressing this problem because it was structured to catch poachers, to deter would-be poachers, and to educate park visitors about the hunting prohibition. Even if Fraire is correct that some poachers might avoid detection by falsely claiming that they were not hunting when questioned by rangers, it is equally true that most hunters seek to obey the law if they know what it is. Overall, we believe the checkpoint advanced the public interest to a significant degree.

The third and final consideration is "the severity of the interference with individual liberty." *Lidster*, 540 U.S. at 427 (quoting *Brown*, 443 U.S. at 51). This factor is "gauged by the objective intrusion, measured by the duration of the seizure and the intensity of the investigation, and by the subjective intrusion, measured by the fear and surprise engendered in law-abiding motorists by the nature of the stop." *Faulkner*, 450 F.3d at 473 (citation and internal quotation marks omitted).

**[10]** The objective intrusion here was slight. Contact between drivers and rangers often lasted only about 15 to 25 seconds, drivers would wait in line at most about one minute, and the rangers merely asked the drivers whether they had been hunting but did not search the vehicles or use carcass-sniffing dogs. *See Lidster*, 540 U.S. at 427 (finding minimal

objective intrusion because "each stop required only a brief wait in line-a very few minutes at most[,]" the contact with police lasted "only a few seconds[,]" and the "[p]olice contact consisted simply of a request for information and the distribution of a flyer"); *Faulkner*, 450 F.3d at 473 (vehicle stop of approximately 20 seconds to impart information resulted in minimal objective intrusion).

**[11]** The severity of the subjective intrusion is "measured by the amount of concern and fright that is generated on the part of lawful travelers." *Faulkner*, 450 F.3d at 473. The subjective intrusion from a checkpoint stop is significantly less than other types of seizures, such as random stops. *Martinez-Fuerte*, 428 U.S. at 558. Here, the subjective intrusion was minimal. The checkpoint was accompanied by signs announcing it, the rangers operating it were uniformed, and all approaching vehicles were stopped. *See Lidster*, 540 U.S. at 428 (little reason for anxiety or alarm where police stopped all vehicles systematically); *Sitz*, 496 U.S. at 453 (noting the fact that uniformed officers stopped every approaching vehicle as showing a minimal intrusion); *Faulkner*, 450 F.3d at 473-74. Although not a dispositive point, we also note that the stops occurred at the park gate, where park visitors expect to stop anyway (to receive a map, to be informed of park rules, to ask questions of the rangers, etc.). This is not a situation in which an encounter with a park ranger would be unexpected, as it might be if a ranger were to search campers' tents or detain hikers on a mountain trail.

## IV.    Conclusion

**[12]** The gravity of the public concerns served by the checkpoint was high, the checkpoint was reasonably related to these concerns, and the severity of the interference with individual liberty was minimal. It follows that the checkpoint was reasonable under the Fourth Amendment and that the district court correctly denied Fraire's motion to suppress.

AFFIRMED.