# NATURAL RESOURCES

## LAW ENFORCEMENT OFFICERS – AUTHORITY TO INSPECT VESSELS FOR AQUATIC INVASIVE SPECIES

February 27, 2015

*The Honorable Wendell R. Beitzel*
*The House of Delegates of Maryland*

*The Honorable George C. Edwards*
*The Senate of Maryland*

You have asked whether Maryland law authorizes the Department of Natural Resources ("DNR") to inspect vessels, and prevent their use on State waters, in an effort to control the spread of aquatic invasive species ("AIS"). We understand your inquiry to be primarily directed at whether members of the Department's Natural Resources Police Force ("NRP" or "NRP officers") may conduct warrantless on-shore inspections of vessels that are brought to the lake. Minnesota has recently enacted legislation that specifically authorizes those actions, and you seek our opinion as to whether similar legislation is needed here in Maryland.

We conclude that Maryland law already gives NRP officers the authority to combat the introduction of AIS through vessel inspections and, when necessary, prevent a vessel from launching into the lake. The NRP's existing statutory authority, however, must be exercised in a manner that comports with the Fourth Amendment's proscription on unreasonable searches and seizures and the similar proscription in Article 26 of the Maryland Declaration of Rights. The real question here, then, is not whether vessels may be inspected for AIS, but rather how those inspections may be conducted within the restrictions of the Fourth Amendment.

The Fourth Amendment ordinarily prohibits searches and seizures carried out without a warrant issued on probable cause, which we expect would be difficult for NRP officers to obtain in the context of vessel inspections for AIS. There are, however, several specific types of warrantless inspections that NRP officers could carry out consistent with constitutional limitations. For example, we believe that DNR could condition the use of the lake on a person's consent to the inspection of vessels and equipment that might contain AIS. DNR could also authorize its officers to conduct checkpoint inspections for AIS, so long as DNR establishes procedures that clearly define the circumstances under which checkpoints may be set up. Finally, DNR may promulgate a protocol for administrative spot inspections that would likely

3

meet the "special needs" exception to the warrant requirement. All of these measures, however, would require that DNR promulgate regulations to ensure that NRP officers carry out these inspections according to an established program and not as matter of individual discretion. Minnesota's AIS program, summarized in section II.C. below, provides one example of the measures that we believe DNR could adopt by regulation.

Ultimately, the legality of a particular search or seizure will turn on the balance between the government's need for the particular search or seizure—here, the need for warrantless inspections of vessels for AIS before they are launched into the lake—and the individual's "reasonable expectation of privacy." Although that balance will vary with the facts of each case, two sets of facts will often tip a properly-confined search for AIS in favor of DNR's authority: First, the owners of most vessels in Maryland already have a diminished expectation of privacy because NRP officers may board and inspect their vessels for compliance with the safety and registration provisions of the State Boat Act. Second, given the importance of the State's aquatic resources and the difficulty of detecting AIS, DNR should be able to establish its legitimate need for warrantless AIS inspections. We thus conclude that DNR already has statutory authority to establish a regulatory protocol that would enable it to conduct warrantless searches and seizures in a manner that is consistent with the Fourth Amendment.

# I

# Background

## A.  *Aquatic Invasive Species*

Aquatic invasive species are broadly referred to as "organisms introduced to marine or freshwater ecosystems to which they are not native and whose introduction causes harm to human health, the environment, or the economy." U.S. Envtl. Prot. Agency, EPA842-B-05-002, *Overview of EPA Authorities for Natural Resource Managers Developing Aquatic Invasive Species Rapid Response and Management Plans*, at 1 (2005) ("EPA Report"). Under Maryland law, AIS qualify as "nuisance organisms," which are defined as any "nonnative aquatic organism that will foreseeably alter or threaten to harm the ecosystem or the abundance and diversity of native or naturalized fish and other organisms." *See* Md. Code Ann., Natural Res.

("NR") § 4-205.1(a)(8).[1] Aquatic invasive species are spread, both intentionally and unintentionally, via various pathways (also called "vectors"), including the discharge of ships' ballast water; the release of marine organisms intended for human consumption, aquaculture, bait, horticulture, aquaria, and the pet trade; and "biofouling" on commercial and recreational vessels.[2] EPA Report at 1. According to EPA, AIS are "considered one of the greatest threats to coastal environments and can significantly affect public water supplies; recreational activities, such as boating; and valuable natural resources, such as fisheries." EPA Report at 1. Nationwide, the economic impact of invasive *fish* species alone is estimated at $5.4 billion annually. *See* David Pimentel *et al.*, *Update on the Environmental and Economic Costs Associated with Alien-Invasive Species in the United States*, 52 Ecological Economics 273, 278 (2005).

Maryland has not been immune from the ill effects of AIS. In the fall of 2013, the nonnative aquatic plant species *Hydrilla verticillata* was found in multiple parts of Deep Creek Lake. In a letter to Deep Creek property owners about a rapid response plan that DNR created to control the species, DNR explained that Hydrilla's "quick growth rate" and its ability "to grow under low light conditions and in deep water" mean that it "can unbalance the lake ecosystem and will negatively impact recreation, fishing and boating." *See* Letter from DNR to Deep Creek Lake Property Owners (May 29, 2014), http://www.dnr.maryland.gov/public lands/pdfs/DCL_propertyownerletter.pdf (last visited Feb. 10, 2015); *see also* COMAR 08.02.19.04B(2)(b) (listing Hydrilla as a "nonnative aquatic organism" under DNR's Nuisance and Prohibited Species regulations). The publication advised boat owners that Hydrilla "reproduces via fragmentation" and that they should "refrain from boating in or around it, as your propeller can cut plants into smaller pieces, which can then reproduce." *Id.*

Other aquatic invasive species of concern in Maryland include:

- Didymo (or "Rock Snot"), an invasive alga of cold flowing waters that can dominate

---

[1] All references to the Natural Resources Article are to the 2012 Replacement Volume of the Maryland Annotated Code, as updated in the 2014 supplement.

[2] Biofouling is the accumulation of aquatic organisms such as microorganisms, plants, and animals on surfaces and structures immersed in or exposed to the aquatic environment. This is the pathway that would be targeted by the inspection measures you describe in your request.

infected rivers and streams. Didymo can be spread from one stream to another in a number of different ways, including on felt-soled waders;[3]

- Zebra mussels, which have been found in some Maryland waters and can be spread from one body of water to another through contaminated bilge water, propellers, and other boat parts and muddy equipment. Zebra mussels out-compete native mussel species for phytoplankton and other nutrients and accumulate in drinking water intakes, culverts, and other man-made structures;[4] and

- Northern Snakehead, a large and aggressive fish that, because of its high reproduction rates and voracious feeding style, could outcompete popular sport fish such as largemouth bass.[5]

## B.  *Current Maryland Law on AIS Control and Prevention*

In 2002, a school of northern snakeheads was discovered in a pond in Crofton, Maryland.  The school had spawned from two snakeheads that had been dumped in the pond more than two years earlier.  The episode revealed "significant gaps in Maryland law regarding management of nonnative aquatic species."  Md. Dep't of Legislative Servs., *The 90 Day Report*, *A Review of the 2003 Legislative Session*, at K-1 (2003).  For example, Maryland law at the time did not contain a statutory prohibition on the

---

[3]  DNR News, "Felt-Soled Waders and Wading Shoes Are On the Way Out – Effective March 21" (Nov. 19, 2011), http://www.dnr.state.md.us/fisheries/news/story.asp?story_id=120 (last visited Feb. 19, 2015).

[4]  DNR News, "More Zebra Mussels Found in Upper Chesapeake Bay" (Dec. 17, 2012), http://news.maryland.gov/dnr/2012/12/17/more-zebra-mussels-found-in-upper-chesapeake-bay/ (last visited Feb. 10, 2015); EPA, "Indicator: Invasion of Zebra Mussels (*Dreissena Polymorpha*) and Quagga Mussels (*Dreissena Bugensis*)," http://www.epa.gov/med/grosseile_site/indicators/sos/dreissena.pdf (last visited Feb. 10, 2015).

[5]  DNR, Information Page on Northern Snakeheads, http://dnr.maryland.gov/fisheries/Pages/snakehead.aspx (last visited Feb. 10, 2015).

release of nonnative species, and DNR lacked the authority to adopt regulations covering nonnative species. *Id.*

In direct response to the snakehead discovery, the Legislature adopted § 4-205.1 of the Natural Resources Article. *See* 2003 Md. Laws, ch. 373. That statute explicitly authorizes DNR's Secretary to adopt regulations to "[p]rohibit the importation, possession, or introduction into State waters of a nonnative aquatic organism in order to prevent an adverse impact on an aquatic ecosystem or the productivity of State waters." NR § 4-205.1(b)(1)(i). Furthermore, the legislation authorizes DNR to "enter and inspect a property to determine whether a state of nuisance exists" as long as DNR has provided reasonable notice of its intent to do so. NR § 4-205.1(c)(1). The statute defines a "state of nuisance" as "a condition in which a nuisance organism will foreseeably alter and threaten to harm the ecosystem or the abundance and diversity of native or naturalized fish and other organisms." NR § 4-205.1(a)(9). The statute does not, however, explicitly address the inspection of vessels.

DNR issued new regulations in 2004 pursuant to its expanded authority. The stated purpose of the regulations "is to control the importation, possession, propagation, transport, purchase, sale, or introduction into State waters of certain nonnative aquatic organisms that, if accidentally or deliberately introduced into or further spread in the waters of the State, would alter and threaten to harm the ecosystem, the abundance and diversity of native or naturalized aquatic organisms, or the productivity of State waters." COMAR 08.02.19.01. The regulations explicitly prohibit a person from "plac[ing] or attempt[ing] to place upon or into State waters a watercraft or associated equipment with attached or contained aquatic plants, zebra mussels, or other prohibited species of nonnative organisms." COMAR 08.02.19.05A; *see also* COMAR 08.02.08.01C ("Except as permitted by the Secretary of Natural Resources, a person may not import into the State or possess any living life stage or reproductive products of mussels of the genus Dreissena"); COMAR 08.02.19.04 ("A person may not import, transport, purchase, possess, propagate, sell, or release into State waters the following nonnative aquatic organisms," including Asian horseshoe crabs, walking catfish, and zebra mussels). Furthermore, "[w]ater taken from waters infested by prohibited nonnative species may not be diverted, appropriated, or transported on public roads," except in a declared emergency or by permit. COMAR 08.02.19.05B.

In 2011, DNR again exercised its regulatory authority under NR § 4-205.1(b), this time to ban the use of felt-soled waders and boots "in State waters or within five feet of State waters." COMAR 08.02.19.07. DNR implemented the ban in an effort to

prevent the spread of Didymo, which resource managers across North America had discovered was being transported from stream to stream on the felt-soled waders of fly fisherman.  DNR, *Felt-Soles Ban – FAQ*, http://dnr.maryland.gov/fisheries/Documents/ Felt_sole_faq.pdf (last visited Feb. 20, 2015).

Maryland's invasive species laws and regulations carry significant penalty provisions.  Any person who violates the AIS provisions of NR § 4-205.1 or a regulation adopted under that section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 30 days or a fine not exceeding $2,500 or both.  NR § 4-205.1(i).

# II

## Analysis

### A.   *Whether DNR Has Statutory Authority to Inspect Vessels for the Presence of AIS and Prevent Them from Entering the Lake*

The first issue raised by your question is whether the State has delegated to DNR the authority to stop, search, and, if necessary, detain vessels before they are launched into the lake.  The decision to grant "a broad general delegation of regulatory authority to administrators, or a more specific delegation, is a choice for the General Assembly."  *Christ v. Maryland Dep't of Nat. Res.*, 335 Md. 427, 439 (1994).  Here, the General Assembly made a broad grant of authority.  The enactment of NR § 4-205.1(b)(1) permits DNR to issue any regulations that would "[p]rohibit the importation, possession, or introduction into State waters of a nonnative aquatic organism in order to prevent an adverse impact on an aquatic ecosystem or the productivity of State waters."  Although DNR's exercise of that authority must be "consistent with the letter and spirit of the law under which the agency acts," *Christ*, 335 Md. at 437, DNR's regulatory prohibition on placing or attempting to place AIS-contaminated vessels into State waters is undoubtedly consistent with NR § 4-205.1(b)(1).

The NRP "specifically is charged with enforcing the natural resource and conservation laws of the State."  NR § 1-204(a).  In fact, NRP officers are given "all the powers conferred upon police officers of the State," and they have "statewide authority" to exercise those powers.  *Id.*; *see also* NR § 1-201.1(a).  NRP officers are thus charged with enforcing *all* natural resources laws and regulations, including the regulatory prohibition against "plac[ing] or attempt[ing] to place upon or into State waters a watercraft or associated equipment with attached or contained aquatic plants, zebra mussels, or other prohibited species of nonnative organisms."  COMAR 08.02.19.05A.

We conclude that the inspection of a vessel[6] for AIS before it is launched is a reasonable and effective method of enforcing the statutory and regulatory prohibition on introducing AIS into the waters of the State and, thus, falls within the existing powers of the NRP. No further legislation is necessary to authorize the NRP to carry out such inspections.

### B. Whether the Fourth Amendment Permits the Types of Warrantless Inspections Necessary to Determine the Presence of AIS on a Vessel

DNR's inspection authority, though consistent with its statute and regulations, must also be carried out consistently with the "search and seizure" protections afforded by the United States and Maryland constitutions. *See*, *e.g.*, *Blair v. United States*, 665 F.2d 500, 505 (4th Cir. 1981) (stating that the authority granted by NR § 8-727 to stop, board, or inspect a vessel in the course of enforcing the State Boat Act "must be read . . . in light of the fourth amendment's requirements . . . , for no statute can authorize a violation of the Constitution"); *see also People v. Maikhio*, 253 P.3d 247, 257 (2011) (fact that a game warden had the implicit authority to stop a vehicle whose occupant had recently been fishing and demand the display of the catch did not necessarily mean that the search comported with the Fourth Amendment). The Fourth Amendment to the U.S. Constitution and Article 26 of the Maryland Declaration of Rights protect citizens from "unreasonable" searches and seizures.[7] The purpose of the protection is to impose a standard of "reasonableness" upon the exercise of discretion by government officials in order "to safeguard the privacy and security of individuals against arbitrary invasions." *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 528 (1967); *see also Wilson v. State*, 409 Md. 415, 427 (2009) ("Reasonableness 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law

---

[6] The term "vessel" is defined by statute to mean "every description of watercraft, including an ice boat but not including a seaplane, that is used or capable of being used as a means of transportation on water or ice." NR § 8-701(s). The term "includes the motor, spars, sails, and accessories of a vessel." *Id.*; *see also* COMAR 08.04.01.01B(28).

[7] Article 26 is generally interpreted consistently with the Fourth Amendment. *See*, *e.g.*, *Byndloss v. State*, 391 Md. 462, 465 n.1 (2006) ("Article 26 of the Maryland Declaration of Rights is, generally, *in pari materia* with the Fourth Amendment of the United States Constitution.").

officers.'") (quoting *Maryland v. Wilson*, 519 U.S. 408, 411 (1997)).

The threshold question under the Fourth Amendment is whether a search or seizure has even occurred, as not every encounter with a law enforcement officer is a "seizure," and not every inspection is a "search." *See*, *e.g.*, *Brower v. County of Inyo*, 489 U.S. 593, 598-99 (1989) (addressing whether a roadblock intended to block suspect's passage was a "seizure"); *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (addressing whether observation of contraband from a public vantage point was a "search"). If a search or seizure occurred, however, the inquiry then turns to whether the search or seizure was unreasonable. *Brower*, 489 U.S. at 599.

Generally, a particular search or seizure is unreasonable unless it is either authorized by a valid warrant issued upon a showing of probable cause or permissible under a recognized exception. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) ("In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement"). The transient nature of vessels and the difficulty detecting AIS make it unrealistic to expect NRP officers to obtain a warrant before detaining a vessel contaminated with AIS. *See*, *e.g.*, *United States v. Kaiyo Maru No. 53*, 699 F.2d 989, 996 (9th Cir. 1983) (explaining that "the logistical problems in establishing a successful inspection program requiring warrants are insurmountable" in the fisheries context and that, "if there is to be a successful inspection program at all, it must be a warrantless one"). Consequently, the permissibility of a vessel search and seizure would depend on whether it qualifies under one of the "'few specifically established and well-delineated exceptions' to the search warrant requirement." *United States v. Brown*, 701 F.3d 120, 126 (4th Cir. 2012) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

In determining whether a given type of search qualifies under one of the established exceptions, the Supreme Court balances, "on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Riley*, 134 S. Ct. at 2484 (quoting *Wyoming v. Houghton*, 526 U. S. 295, 300 (1999)). The Court will examine whether the application of an exception to a particular search results in the "appropriate balance," *id.*, because the "ultimate touchstone of the Fourth Amendment is reasonableness." *Id.* at 2482.

The balancing of interests required by the reasonableness standard is heavily fact-dependent. As a result, the degree to

which an officer's inspection of a vessel for the presence of AIS implicates Fourth Amendment protections will vary with the particular circumstances and the type of exception involved. *See*, *e.g.*, *Santos v. Frederick County Bd. of Comm'rs*, 725 F.3d 451, 460 (4th Cir. 2013) (explaining that each of the three different categories of police-citizen encounters identified by the Supreme Court—"consensual" encounters, "brief investigative detentions," and arrests—"represents differing degrees of restraint and, accordingly, requires differing levels of justification"), *cert. denied*, 134 S. Ct. 1541 (2014); *see also Illinois v. Gates*, 462 U.S. 213, 232 (1983) (remarking that the Fourth Amendment reasonableness standard is not susceptible to a "neat set of legal rules"). We begin our analysis with the types of warrantless inspections that raise the fewest Fourth Amendment concerns and then discuss those that require greater justification.

**1. Plain-View Inspections and Seizures When AIS Are in Open View**

Not every inspection is a "search" for purposes of the Fourth Amendment. For example, "what a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351. The rationale behind the so-called plain-view doctrine is that, "if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment." *Dickerson*, 508 U.S. at 375. Accordingly, "law enforcement officers may seize evidence in plain view, provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made." *Kentucky v. King*, 131 S. Ct. 1849, 1858 (2011) (citing *Horton v. California*, 496 U.S. 128, 136-140 (1990)). The visual inspection of the exterior hull of a vessel by an NRP officer thus would not be a "search" within the scope of the Fourth Amendment unless the officer has improperly arrived at the spot from which the officer made the observation.

Assuming that an NRP officer sees AIS on a vessel from a lawful vantage point, such as a public boat ramp, the next question is whether the officer may prevent the vessel from launching by detaining the operator. An officer may conduct a brief investigative detention, known as a "Terry stop," if he or she has "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). A Terry stop, however, must be brief; the police must "diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly. . . ." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). If the stop extends beyond that point, it will ripen into a full

arrest—the "most intrusive type of police-citizen encounter." *Santos*, 725 F.3d at 460. A full arrest must be supported by probable cause, that is, "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *see also United States v. Carillo-Rivas*, 438 F. App'x 227, 228 (4th Cir. 2011) (same).

The detention of an operator to prevent him from introducing AIS into State waters would likely qualify as an arrest. But, if the NRP officer has seen AIS in plain view and the operator has refused the officer's lawful order to refrain from entering the water, we believe the officer would have probable cause to arrest the person and prevent the launch of the vessel. *See, e.g.*, *United States v. Raub*, 637 F.2d 1205, 1210-11 (9th Cir. 1980) (upholding seizure of an illegal catch in plain view). There is no need for additional regulations to authorize NRP officers to carry out these types of plain-view searches and seizures.

### 2. Consensual Inspections

Consensual encounters, like the plain-view inspections discussed above, "do not implicate Fourth Amendment protections." *Santos*, 725 F.3d at 460; *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991). Specifically, "[l]aw enforcement officers do not violate the Fourth Amendment[] . . . merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *State v. Green*, 375 Md. 595, 609 (2003) (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002)). Thus, "[a]s long as police officers do not induce cooperation by coercive means, they may pose questions, ask for identification, and request consent to search luggage even if they have no basis for suspecting that a particular individual has engaged in criminal activity." *Id.* at 609 (internal quotation marks omitted).

Applying these principles in a context relevant to your question, the Minnesota Supreme Court held that the conduct of an officer who "walk[ed] up to [the boat owner] and convers[ed] with him while [the] boat rested on the trailer of a parked portage truck" did not amount to a seizure for Fourth Amendment purposes. *State v. Colosimo*, 669 N.W.2d 1, 4 (Minn. 2003). Although a factual dispute might arise as to whether a particular encounter is truly consensual, *see, e.g.*, *Santos*, 725 F.3d at 461-62 (addressing the question of whether the person being interviewed felt free to leave), or whether an inspection exceeded the scope of the consent, *see, e.g.*, *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (addressing whether the defendant's consent to

the search of his car included the bags inside it), a truly consensual search does not raise Fourth Amendment issues.

There is no need for additional regulations to authorize an NRP officer to approach a member of the public on or near the public boat ramp, ask to inspect the vessel and related equipment for AIS, and, upon consent, carry out the inspection. But DNR might be able to *expand* the universe of inspections that fall within the "consensual" category by issuing a regulation that explicitly conditions the use of vessels on the lake on the operator's consent to inspection for AIS. We base this conclusion on the General Assembly's specific grants of authority to DNR to manage the lake.

Both the Maryland Code and DNR's regulations make clear that DNR has broad authority to regulate the use of Deep Creek Lake. The State bought and owns the lake, "including the land under the lake and the buffer strip." COMAR 08.08.01.01B.[8] The DNR Secretary, along with the Deep Creek Lake Policy and Review Board, must prepare "a plan that provides for the wise use, protection, and management of the natural and recreational resources of [the lake]," and DNR may adopt regulations to "[p]rotect the . . . natural resources and the environment" or to implement the plan. NR § 5-215.1(b)(1), (d); *see also* COMAR 08.08.01.01C ("The Department has authority and responsibility under State law to regulate many public, recreational uses of natural resources in and around the lake, such as boating and fishing."). In fact, DNR's regulations make clear that the use of the lake is a *privilege*, not a right: "The Department has allowed and will allow the public and surrounding landowners to use, and in certain instances to occupy, the waters of the lake, the land beneath the lake, and the buffer strip, but only as a matter of privilege." COMAR 08.08.01.01B.[9]

A case involving Tennessee wildlife officers' search and seizure of duck blinds on a state-managed lake suggests the extent to which a state may explicitly condition the exercise of a state-granted recreational privilege on a person's consent to inspections. In *Hamilton v. Myers*, a federal court noted that,

---

[8]  A history of the lake and the State's purchase of it can be found on DNR's website, at http://dnr.maryland.gov/publiclands/Pages/western/deepcreeknrma.aspx.

[9]  DNR already imposes a number of conditions on the use of the lake. *See*, *e.g*., § 5-215(c) (boat ramp fee); COMAR 08.18.03.03 (noise limits); 08.18.03.08 (use of a muffler); 08.18.33.03 (speed limits); and 08.18.33.02 (permissible types of vessels and date, time, and location restrictions).

under Tennessee law, "he who undertakes to avail himself of a privilege granted by the State must do so on whatever terms and conditions the State chooses to annex to the exercise of the privilege, including the waiver of constitutional rights." 281 F.3d 520, 532 (6th Cir. 2002) (quoting *Monroe v. State*, 253 S.W.2d 734, 735-36 (Tenn. 1952)). Then, the court stated that, by state statute, "[e]veryone who participates in the privilege of hunting has a duty to permit inspections to determine whether they are complying with applicable laws" and that a "boat or blind can be searched at any time during hunting season." *Id.* at 531-32. Based on this State law, the court held that "officers clearly have the authority to go on property to inspect visible waterfowl blinds during an open hunting season" and that the officers in question did not act unconstitutionally when they searched, and then seized, the plaintiffs' duck blind. *See id.* Other courts have reached similar conclusions. *See United States v. Whitaker*, 592 F.2d 826, 829-30 (5th Cir. 1979) (explaining that there is a low expectation of privacy on boats subject to numerous regulatory restrictions); *United States v. Greenhead, Inc.*, 256 F. Supp. 890, 893 (N.D. Cal. 1966) (holding that hunting wildfowl "is a high privilege granted by the people and subject to immediate withdrawal"); *Colosimo*, 669 N.W.2d at 5 ("Recreational fishing is a highly regulated and licensed privilege. Those who choose to apply for this privilege accept the conditions imposed.").[10]

Some courts have upheld searches on the theory that a person who hunts or fishes impliedly consents to inspections of fish or game bags even in the absence of a statute expressly requiring such consent as a condition of using State natural resources. *See State v. Halverson*, 277 N.W.2d 723, 724-25 (S.D. 1979) ("Since it is a privilege to hunt wild game, a hunter tacitly

---

[10] In other contexts, courts have made clear that there are limits to the principle that a government may impose conditions on its discretionary grant of benefits. Specifically, the doctrine of unconstitutional conditions prohibits the termination of benefits "if the termination is based on motivations that other constitutional provisions proscribe." *Adams v. James*, 784 F.2d 1077, 1080 (11th Cir. 1986) (citing *Thomas v. Review Bd.*, 450 U.S. 707 (1981)); *cf. 63 Opinions of the Attorney General* 595, 601-02 (1978) (concluding that conditioning entrance to port facility on a search for stolen goods, as opposed to a search for security purposes, would likely be impermissible). The doctrine would not apply here, however, as the State's motivation to protect the lake from AIS is not proscribed by constitutional provisions. As discussed in greater detail below, a programmatic search for AIS is more akin to a preventative security search, which is permissible, than to a warrantless search for the evidence of a crime, which is not. *See infra* at 14-16.

consents to the inspection of any game animal in his possession when he makes application for and receives a hunting license."); *State v. Layton*, 552 N.E.2d 1280, 1287 (Ill. App. 3d. 1990) ("The roving conservation officer patrol stopping hunters, encountered in the field . . . does not violate the fourth amendment" because hunters are deemed to have "consent[ed] to some intrusions" when they get a hunting license or hunt without one.). As stated by the Ninth Circuit, "a person's relationship with the state can reduce that person's expectation of privacy even within the sanctity of the home." *Sanchez v. County of San Diego*, 464 F.3d 916, 927 (9th Cir. 2006) (upholding warrantless home visit by social workers to verify a benefit-recipient's actual presence at the place designated as their residence).[11]

There are, however, limits to this approach. Like all searches and seizures, a search justified by implied consent must be reasonable under the circumstances. *See* 4 LaFave, Search and Seizure § 8.2(*l*), at 165 (5th ed. 2012). But we believe that a properly-noticed regulation informing boaters that, by using the lake, they consent to a properly-focused search for AIS would enable NRP officers to conduct warrantless searches that would survive constitutional scrutiny under the cases discussed above. The management of the lake through such a regulation might obviate the need for the types of inspections that we discuss next, which raise other Fourth Amendment concerns.

### 3. Fixed Checkpoint Searches

The stop of a vehicle at a checkpoint is a "seizure" for Fourth Amendment purposes. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). The constitutionality of a particular checkpoint stop or inspection is determined by "balancing the intrusion on the individual's Fourth Amendment interests against the promotion of legitimate governmental interests." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979). "Suspicionless checkpoint searches are permissible under the Fourth Amendment when a

---

[11] The Ninth Circuit rejected the implicit consent theory in another case in which wildlife officials conducted a roving stop of a motorist in a national forest. *United States v. Munoz*, 701 F.2d 1293, 1301 (9th Cir. 1983). There, the court reasoned that Congress did not intend to condition the use of national parks on the surrender of one's privacy when "one of the primary purposes" of national parks is for the visitor's "respite and reflection" and "fundamental right to be left alone." *Id.* at 1298. *Munoz* does not control your question; the General Assembly has already made clear that there is little privacy interest in most vessels and that the use of the lake is subject to extensive State regulation.

court finds a favorable balance between 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" *United States v. Hartwell*, 436 F.3d 174, 178-79 (3d Cir. 2006) (quoting *Illinois v. Lidster*, 540 U.S. 419, 427 (2004)). For example, the Maryland Court of Appeals has concluded that the intrusion on individual liberties caused by a temporary sobriety checkpoint was minimal when "balanced against the State's compelling interest in detecting and deterring drunk driving." *Little v. State*, 300 Md. 485, 506 (1984).

Nonetheless, the courts have cautioned that checkpoints may not be used as a pretext for random searches for general law enforcement purposes; after all, the purpose of the warrant requirement is to protect the public from suspicionless searches and seizures that are wholly at the discretion of police officers. *See Katz*, 389 U.S. at 358-59 ("[B]ypassing a neutral predetermination of the scope of a search leaves individuals secure from Fourth Amendment violations only in the discretion of the police." (internal quotation marks omitted)). Courts therefore have stressed that checkpoints set up to further a specific programmatic purpose must be conducted in accordance with a predetermined protocol that limits the discretion of the officers in the field. *See Little*, 300 Md. at 506. In upholding the constitutionality of the sobriety checkpoint at issue in *Little*, the Court of Appeals noted the characteristics that made the checkpoint permissible:

> The checkpoints are operated under limitations imposed by clear, carefully crafted regulations approved by high level administrators. The regulations severely restrict the discretion of the officers in the field. All vehicles are stopped; there is virtually no risk that motorists will be singled out arbitrarily. The procedures to be followed when communicating with each driver are set forth in detail in the regulations; thus, the risk of police harassment is greatly reduced.

*Id.*; *see also* 89 *Opinions of the Attorney General* 158, 159 n.1 (2004) ("Although stopping a driver at a sobriety checkpoint is a seizure for purposes of the federal and State constitutions, such a seizure may be reasonable, particularly if it is conducted in a manner that limits officer discretion."). An enforcement agency's adoption of procedures can thus serve to affect the balance between individual privacy interests and governmental interests by reducing the risk of arbitrary searches and thereby lessening the inspection's intrusion on individual liberties.

State courts across the country have regularly upheld the use of checkpoints for the enforcement of fish and wildlife laws in cases where the officers used set procedures reasonably related to the enforcement goal. In these cases, the courts found that the programmatic purpose of resource conservation, combined with the difficulty of enforcing those laws through other means, outweighed what the courts have generally perceived to be a minimal privacy interest in the contents of a fish or game bag. *See*, *e.g.*, *State v. Sherburne*, 571 A.2d 1181, 1184 (Me. 1990) (noting the "important conservation purpose furthered by a roadblock" set up to enforce fishing laws); *Drane v. State*, 493 So.2d 294, 298 (Miss. 1986) ("It is difficult to see how [the] purposes [of the wildlife conservation statute] can be effected if game wardens were not empowered to make routine stops of vehicles in wildlife management areas."); *State v. Tourtillott*, 618 P.2d 423, 430 (Or. 1980) ("We conclude that the governmental interest in the enforcement of laws for the preservation of wildlife in this state is sufficiently substantial to justify the minimal intrusion upon the Fourth Amendment rights of those stopped for brief questioning and a visual inspection of their vehicles."); *Halverson*, 277 N.W.2d at 725 ("The intrusion into the right of the non-hunter to the uninterrupted use of the highways is slight and greatly outweighed by the public interest in the management and conservation of wildlife in this state.").

Likewise, the Ninth Circuit has held that a checkpoint stop by a federal ranger posted at an information station was reasonable where the purpose was to distribute litter bags, "which included regulations concerning campfires for fire safety, refuse disposal for litter control, and camp restrictions." *United States v. Faulkner*, 450 F.3d 466, 470 (9th Cir. 2006). As the court explained, "[t]he primary purpose of the information station was not to advance the general interest in crime control, and the gravity of the public concerns served by the seizure and the degree to which the seizure advanced the public interest outweigh the minimal interference with individual liberty." *Id.* at 474. The interest identified there was instead the prevention of "littering, illegal fires, and driving while intoxicated," which, the court concluded, "serves a purpose beyond the general interest in crime control." *Id.* at 471; *see also United States v. Rodriguez*, C.R. C-09-1026M, 2009 WL 5214031, at *4 (S.D. Tex. Dec. 23, 2009) (holding that a ranger's checkpoint stop of a park visitor, conducted as part of program to audit the collection of park fees, was not an unreasonable seizure because it "involve[d] an important public concern, a method that advance[d] that concern, and minimal encroachment into the private lives of park visitors").

The procedures followed at the checkpoint addressed in *United States v. Fraire*, 575 F.3d 929 (9th Cir. 2009), provide

another example of practices found acceptable in the resource conservation context. There, park rangers set up a checkpoint to prevent individuals from illegally hunting animals in the park. *Id.* at 930. The court held that "a momentary checkpoint stop of all vehicles at the entrance of a national park, aimed at preventing illegal hunting," was reasonable under the Fourth Amendment because it was "minimally intrusive, justified by a legitimate concern for the preservation of park wildlife and the prevention of irreparable harm, directly related to the operation of the park, and confined to the park gate where visitors would expect to briefly stop." *Id.* The court described the checkpoint as follows:

> The checkpoint was implemented near one of the multiple park entrances and stopped all vehicles entering and exiting the park at that point. Rangers posted signs prior to the checkpoint instructing drivers to prepare to stop, concluding with stop signs, a cone pattern, a ranger station, and a ranger in a reflective jacket directing traffic. All rangers participating in the checkpoint were uniformed.
>
> After a vehicle was stopped at the checkpoint, a ranger would approach the vehicle, identify himself or herself as a park ranger, state that he or she was conducting a hunting checkpoint, and then ask the driver, "have you been hunting" or "are you hunting?" If the driver responded that he or she was not hunting, the ranger would not search the vehicle's trunk.

*Id.* at 931.

In our opinion, DNR may institute similar checkpoint searches for AIS by promulgating "clear, carefully crafted regulations" that limit the scope of the search to the specific programmatic purpose of preventing the spread of AIS, "severely restrict the discretion of the officers in the field," and "set forth in detail" the "procedures to be followed when communicating with each driver." *See Little*, 300 Md. at 506. Like the fish and game searches upheld in the cases cited above, a search conducted properly under regulations like these would likely strike the appropriate balance between the gravity of the State's needs and

the degree to which the inspection intrudes on a person's reasonable expectation of privacy.[12]

On the "State needs" side of the balance, the need to prevent the spread of AIS is well-established. *See* EPA Report at 1. Also well-established is the legitimacy of Maryland's interest in protecting and conserving its natural resources. *See*, *e.g.*, *Smith*, *Owner of the Sloop Volant*, *v. Maryland*, 59 U.S. 71 (1855) (affirming Maryland's power to enact a law that banned the taking of oysters by certain means and authorized the seizure and forfeiture of vessels used for those purposes). Moreover, the State's programmatic need for the ability to inspect for AIS in the field, without first obtaining a warrant based on probable cause, is also easily established. As the courts have noted in the fish and wildlife cases discussed above, a warrant requirement would make it practically impossible to enforce laws governing mobile activities like fishing and hunting. *See*, *e.g.*, *Kaiyo Maru*, 699 F.2d at 996.

On the "privacy" side of the balance, the degree to which the operators of vessels have a reasonable expectation of privacy as to the vessel will vary with the type of vessel, the areas searched, and other factors. *See United States v. Gollwitzer*, 697 F.2d 1357, 1360 (11th Cir. 1983) ("The degree of privacy one may reasonably expect varies according to the vessel one is aboard."); *Colosimo*, 669 N.W.2d at 5-6 (examining whether there were "any areas of the open boat where [the owner's] expectation of privacy was unreasonable"); *People v. Butorac*, 3 N.E.3d 438 (Ill. App. Ct. 2013), *appeal denied*, 5 N.E.3d 1125 (Ill. Mar. 26, 2014) (reviewing cases in which courts applied motor-vehicle checkpoint case law to suspicionless stops of various watercraft).

For almost all vessels used on the lake, however, a person's expectation of privacy is likely minimal, for two reasons. First, DNR regulations limit the size of vessels that may be used on the lake, so it is unlikely that an inspection at the lake's boat ramps

---

[12] By contrast, we have previously disapproved of a program that would have given Maryland Port Administration officers the discretion to decide which vehicles to stop at port facility entrances to search for stolen cargo. *See* 63 *Opinions of the Attorney General* at 604-05. The opinion concluded that the officers had too much discretion, that case law at the time did "not support finding justification for a full automobile search in the face of danger of economic loss alone," and that "the balance remains tipped against the intrusion and in favor of the individual's right to privacy." *Id.*

would involve the operator's living quarters.[13]  Second, and more importantly, vessels are already subject to safety and registration inspections by NRP officers under the State Boat Act; in the course of enforcing that law, an NRP officer "may stop, board, or inspect" any vessel.  NR § 8-727(b).  A person thus does not have a reasonable expectation of privacy in the areas of a vessel that might be inspected under those provisions.  In *United States v. Albers*, 136 F.3d 670 (9th Cir. 1998), for example, the court held that the warrantless search of a houseboat on Lake Powell did not intrude upon places in which the defendant had a reasonable expectation of privacy.  The court explained:

> [The Defendant] had . . . a reduced expectation of privacy because at any time an authorized person could have stopped and boarded his boat "to determine compliance with regulations pertaining to safety equipment and operation."  Indeed, the government's traditional power to board a vessel is far greater than its power to enter a motor home or a car, *see United States v. Villamonte-Marquez*, 462 U.S. 579, 592 (1983) (suspicionless boarding of ships for inspection of documents not contrary to Fourth Amendment).

*Id.* at 673 (internal citation omitted).  For the most part, then, an inspection of vessels for AIS probably would not intrude on a person's reasonable expectation of privacy.

In sum, the State's need to prevent the spread of AIS will in most cases outweigh a person's diminished expectation of privacy in a vessel that the person proposes to launch into the lake. Accordingly, in our view, DNR's use of checkpoint inspections for AIS would be lawful so long as (1) DNR adopts clear procedures that further the enforcement goal of preventing the spread of AIS and restrict the discretion of the officers and (2) the inspections are in fact conducted in accordance with those procedures.

---

[13] Boats on Deep Creek Lake generally may not exceed 26 feet in length, or 30 feet for pontoon boats, and houseboats are not permitted. *See* COMAR 08.18.33.02; *see also* DNR's "Deep Creek Lake NRMA Resource Guide" (rev'd June 2010), http://www.dnr.state.md.us/ publiclands/pdfs/DCL_BoatingResourceGuide.pdf (last visited Feb. 10, 2015).

### 4. Other Warrantless Detentions and Inspections: The "Special Needs" Exception

There are other circumstances, in addition to those discussed above, in which it may be permissible for an officer to conduct a warrantless vehicle stop. One example is the so-called "Terry stop," which we discussed above in the context of plain-view inspections that fall outside the Fourth Amendment. *See supra* at 9. It may be difficult, however, to formulate the "reasonable articulable suspicion of criminal activity" that a Terry stop requires when some invasive species are either too small to see or attached to equipment not in plain view.[14] Because the officer's "suspicions must be more than an inchoate and unparticularized suspicion or hunch," *United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010) (citations and internal quotation marks omitted), a Terry stop might be difficult to justify in this context.

The fact that it may be difficult to conduct a valid Terry stop thus raises the question of whether an officer may conduct spot inspections of vessels when the officer does not have reasonable articulable suspicion that the vessel is contaminated by AIS and is not stationed at a fixed checkpoint. Cases from other jurisdictions mostly, but not uniformly, suggest that officers may conduct spot inspections to enforce fish, game, and park laws when the search is limited to the scope necessary to enforce the particular law. The courts that have upheld such inspections have generally reached that result by one of two routes—the implied consent of an individual to the search, or the characterization of such inspections as "special needs" searches exempt from the warrant requirement—and sometimes through reasoning that seems to combine the two.

As discussed above, we believe that the implied consent theory could justify a warrantless search for AIS, but that DNR could bolster its authority in this respect by *expressly* making the boater's consent a condition to the use of the lake. *See supra* at

---

[14] For example, in addressing a Maine law designed to prevent the introduction of nonnative parasites into Maine waters by prohibiting the importation of out-of-state baitfish, the Supreme Court noted testimony that "the small size of baitfish and the large quantities in which they are shipped made inspection for commingled species a physical impossibility." *Maine v. Taylor*, 477 U.S. 131, 141 (1986) (internal quotation marks omitted); *see also* Emi Kondo *et al.*, *Are State Watercraft Inspections Constitutionally Permissible Searches?*, 3 Ariz. J. Envtl. L. & Pol'y 105, 113-14 (2013) (discussing warrantless searches in the context of AIS control and noting the difficulty of perceiving some types of AIS).

11-12. We also believe, however, that suspicionless inspections of vessels for AIS, before the vessels are launched into the lake, would fall within the "special needs" exception to the Fourth Amendment's warrant requirement.

Under the "special needs" doctrine, "[a] search unsupported by probable cause can be constitutional . . . when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (internal quotation marks omitted); *see also Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2081 (2011) (citing examples, including the need to test train operators to ensure that they are not under the influence of drugs or alcohol). In order for this exception to apply, the State's "special need" for the search must be "divorced from the State's general interest in law enforcement." *Ferguson v. City of Charleston*, 532 U.S. 67, 79 (2001). The doctrine does not apply when the state's interest "is ultimately indistinguishable from the general interest in crime control." *Id*. at 81 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000)).

The special needs exception originated in the context of spot inspections of regulated commercial premises, which are deemed to implicate a lesser privacy interest than that attached to a person's home. *See*, *e.g.*, *Marshall v. Barlow's*, *Inc*., 436 U.S. 307, 313 (1978) ("Certain industries have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise."). In that context, the exception was known as the *Biswell-Colonnade* exception after two early cases justifying warrantless searches of liquor licensees, *Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970), and gun shops, *United States v. Biswell*, 406 U.S. 311 (1972). Since then, courts have applied the exception to warrantless inspections of a variety of business enterprises, including automobile junkyards and mining operations. *See New York v. Burger*, 482 U.S. 691, 701 (1987).

Although the special needs doctrine developed within the commercial context, it is now applied more generally to any context in which the government's "need for a search" in a particular category of cases outweighs "the offensiveness of the intrusion." *United States v. Edwards*, 498 F.2d 496, 500 (2d Cir. 1974). For example, it has been applied to uphold the constitutionality of warrantless searches of individuals at airports, *id*., and subways, *MacWade v. Kelly*, 460 F.3d 260, 269-73 (2d Cir. 2006), where the government's anti-terrorism interests are strong and the stigma associated with the search is minimal. This broader articulation of the principle came to be known as the "special needs" exception after Justice Blackmun first used the term in his concurrence in *New Jersey v. T.L.O.*, 469 U.S. 325,

351 (1985). *See also Ferguson*, 532 U.S. at 74 n.7 (describing origin of the term).

The Supreme Court has set three threshold criteria for the special needs exception: (1) there is "a substantial government interest that informs the regulatory scheme pursuant to which it is made"; (2) "[t]he warrantless search . . . [is] necessary to further the regulatory scheme"; and (3) "[t]he statute's inspection program, in terms of the certainty and regularity of its application, . . . provide[s] a constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 702-03 (internal quotation marks omitted). Further, the exception applies only "[i]n limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion." *Chandler v. Miller*, 520 U.S. 305, 314 (1997) (quoting *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 624 (1989)). Thus, like the types of warrantless searches discussed above, the permissibility of a warrantless administrative search ultimately turns on the balance between the property owner's privacy interest and the government's need for the inspection.

Although the Supreme Court has not addressed the applicability of the special needs exception to spot inspections to enforce fish, game, and park laws, other courts have regularly upheld warrantless searches of vessels in the resource conservation context. For example, in one Ninth Circuit case, a fisheries officer discovered an illegally-caught salmon when he boarded a fishing vessel to check the operator's papers for compliance with fishing regulations, as he was authorized to do by federal law. *Raub*, 637 F.2d at 1207. Noting the "historical and pervasive regulation of the salmon fishing industry in the Puget Sound area, the important federal interests at stake, and the limited possibility of abuse," the court held that the warrantless searches authorized by the federal statute did not violate the Fourth Amendment. *Id.* at 1211 (applying the *Biswell-Colonnade* exception).

In *Kaiyo Maru*, the Ninth Circuit similarly applied the administrative search exception to uphold warrantless inspections of vessels within the Fishery Conservation Zone (FCZ); the inspections were a means of enforcing federal fisheries laws and were authorized under the Fisheries Conservation and Management Act. 699 F.2d at 996-97. Ultimately, the Court concluded that "the statute and enforcement policy of the Coast Guard sufficiently limit the discretion of the inspecting officers in the field as to render warrantless FCMA inspections 'reasonable' within the meaning of the fourth amendment." *Id.* at 996 (footnote omitted).

State courts have also applied the special needs concept in the resource conservation context. For example, the Minnesota Supreme Court upheld the warrantless inspection of a recreational fisherman's vessel on the grounds that "[r]ecreational fishing is a highly regulated and licensed privilege" and, thus, the fisherman "had no reasonable expectation of privacy" in "the areas of his open boat or other conveyance used to typically store or transport fish." *Colosimo*, 669 N.W.2d at 4-8. The California Supreme Court applied the same exception to justify a state game warden's stop of a driver he had earlier seen fishing with a "handline"—a method used for catching lobster, which was out of season at the time. *Maikhio*, 253 P.3d at 250. The court upheld the stop, explaining that, "[i]n light of the number and nature of the regulations that apply to fishing and hunting and the type of enforcement procedures that are necessary to enforce such regulations, anglers and hunters have a reduced reasonable expectation of privacy when engaged in such activity." *Id*. at 262.

In our view, DNR could adopt and implement a program of spot inspections that would meet the three criteria set by *Burger* and, in most circumstances, the overall reasonableness requirement of the Fourth Amendment. As to the first criterion, the State clearly has a "substantial government interest" in protecting its natural resources from AIS; the Court of Appeals has recognized that "fisheries constitute one of the most important and valuable natural resources of the State, and their protection, preservation, development and maintenance are an imperative duty of Government."[15] *Dorsey v. Petrott*, 178 Md. 230, 235 (1940); *see also*, *e.g.*, *Kaiyo Maru*, 699 F.2d at 995 (upholding warrantless administrative inspections of vessels within the federal Fishery Conservation Zone and recognizing the "strong federal interest in protecting natural resources within the [zone]"); *State v. McKeen*, 977 A.2d 382, 386 (Me. 2009) (upholding statute authorizing warrantless inspections of all-terrain vehicles

---

[15] The General Assembly has stated, in multiple contexts, that the State's natural resources must be protected and conserved. *See* NR § 1-302 (declaring that "[t]he protection . . . of the State's diverse environment is necessary for the maintenance of the public health and welfare and is a matter of the highest public priority"); NR § 5-102(a)(1) ("find[ing]" that "[f]orests, streams, valleys, wetlands [and] parks . . . are basic assets and their proper use . . . and preservation are necessary to protect and promote the . . . general welfare"); Md. Code Ann., Envir. § 4-101 (2013 Repl. Vol.) ("find[ing]" and "determin[ing]" that "lands and waters comprising the watersheds of the State are great natural assets and resources"); *see also* Md. Code Ann., Land Use § 1-201 (2012) (including "resource conservation" as a "vision" to be implemented through the land planning process).

and recognizing Maine's "legitimate and substantial interest in its natural resources"); *cf. United States v. Oceanpro Indus., Ltd.*, 674 F.3d 323, 331 (4th Cir. 2012) (in addressing whether Maryland and Virginia had suffered harm from illegal harvesting of rockfish, stating that the states "surely did possess a legitimate and substantial interest in protecting the fish in their waters as part of the natural resources of the State"). Moreover, the regulations adopted pursuant to NR § 4-205.1(b) are for the express purpose of "preventing an adverse impact on an aquatic ecosystem or the productivity of State waters." There is thus little doubt that Maryland has a "substantial government interest," *see Burger*, 482 U.S. at 702-03, in protecting its aquatic ecosystems and maintaining the productivity of State waters by preventing the spread of AIS.

The second criterion—that a program of warrantless inspections is necessary to further the particular regulatory scheme—should also be easy to meet for warrantless inspections for AIS. Courts have long recognized that hunting and fishing laws may be difficult to enforce without a program of warrantless searches. *See Kaiyo Maru*, 699 F.2d at 996; *see also Layton*, 552 N.E.2d at 1287 ("It is elemental that wildlife licensing and regulatory provisions must be enforceable during the hunt and immediately following it."); *Maikhio*, 253 P.3d at 263 ("[A] substantial number [of cases] have upheld roving suspicionless stops of persons a game warden reasonably believes have been fishing or hunting."); *Elzey v. State*, 519 S.E.2d 751, 755 (Ga. Ct. App. 1999) (citing cases that "correctly recognize that actions by wildlife law enforcement officers in questioning hunters and checking their licenses and identification may be reasonable, even though such actions might be unreasonable outside the hunting context"). Similarly, a requirement that NRP officers procure a warrant before inspecting vessels for AIS contamination would significantly interfere with the State's ability to prevent the spread of AIS through field inspections.

Third, in order to provide an adequate substitute for the warrant requirement, the controlling law must advise the owner of the searched premises "that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers" by limiting the "time, place and scope" of the inspection. *Burger*, 482 U.S. at 703 (internal quotation marks omitted); *see also Tarabochia v. Adkins*, 766 F.3d 1115, 1123-24 (9th Cir. 2014) (finding a search unconstitutional in part because the fisheries laws that the officers were purportedly enforcing when they stopped an individual's car on the highway did not limit the scope of searches that could be performed under that authority).

As of now, there is no such law that would apply to sufficiently limit the scope of vessel inspections for AIS. However, in our opinion, DNR has the authority to issue regulations that would meet the standard set by *Burger*. The powers delegated to DNR to manage Deep Creek Lake include the authority to issue regulations to "[p]rotect the . . . natural resources, and the environment." NR § 5-215.1(d)(1)(i). Legislative regulations issued pursuant to this grant of authority have the force of law. *See Building Materials Corp. of Am. v. Bd. of Educ. of Baltimore County*, 428 Md. 572, 591 n.25 (2012) (distinguishing interpretive regulations from legislative regulations, which "result from a specific statutory grant, and are treated and enforced as binding law"); 75 *Opinions of the Attorney General* 37, 43-50 (1990) (same).

With respect to the content of such regulations, they should specify the areas of watercraft that are subject to inspection for AIS control so that people who launch vessels into State waters understand the level of privacy they might reasonably expect in their vessel, equipment, and other possessions both on the water and at a boat ramp. The regulations should also define the manner in which inspections are carried out so that the time, place, and scope of the inspection is not left to the discretion of the inspecting officer. We believe that warrantless inspections carried out pursuant to such regulations would fall within the "special needs" exception to the Fourth Amendment's warrant requirement.

## C.   *Minnesota's Approach*

The State of Minnesota has already provided one example of such an administrative enforcement program. In 2011, the state enacted legislation establishing a comprehensive mandatory vessel inspection program. *See* 2011 Minn. Laws, ch. 107 § 27. Compliance with the program's inspection requirements was made "an express condition of operating or transporting water-related equipment." Minn. Stat. § 84D.105, subd. 1. Under its program, inspectors are authorized to "visually and tactilely inspect watercraft and water-related equipment" for the presence of AIS. *Id.*, subd. 2(b). Inspections are limited to those areas of the vessel and water-related equipment that might reasonably contain AIS, such as the exterior and certain internal areas such as bilges, livewells, bait containers, and other areas that may contain contaminated water. *Id.*; *see also* Minn. Stat. § 84D.01, subd. 18a (defining "water-related equipment").

The law authorizes placement of inspection stations "at or near public water accesses or in locations that allow for servicing individual or multiple water bodies." *Id.*, subd. 2(f). In recognition of the time, place, and scope restrictions developed by

the courts, the program requires that inspection stations have "adequate staffing to minimize delays to vehicles and their occupants," be "located so as to not create traffic delays or public safety issues," and not "reduce the capacity or hours of operation of public water accesses." *Id.* Inspectors are given express authority to "prohibit an individual from placing or operating water-related equipment in water of the state if the individual refuses to allow an inspection of the individual's water related equipment or refuses to remove and dispose of aquatic invasive species." *Id.*, subd. 1.[16]

Although no court has evaluated the constitutionality of the Minnesota program in the context of the Fourth Amendment case law discussed above, it is our view that the Minnesota inspection program, on its face, strikes a good balance between individual privacy interests and the state's interest in protecting and preserving its natural resources. In our opinion, DNR could institute such a program via its broad regulatory authority under NR § 4-205.1(b)(1).

## III

### Conclusion

The General Assembly has delegated to DNR broad authority to prohibit the introduction of AIS into State waters and to manage Deep Creek Lake. No further legislation is needed to authorize NRP officers to carry out vessel inspections as a means of implementing that prohibition. Additional regulations, however, would clarify DNR's authority to proceed, without a warrant, to inspect a vessel for AIS and prevent the operator from launching it into the lake. Minnesota's AIS program, summarized above, exemplifies the type of administrative search program that we believe DNR could adopt by regulation.

Additionally, the State may condition the use of the lake, which the State owns, on the operator's express consent to the inspection and, if necessary, on the de-contamination of any

---

[16] The law also provides expanded authority for "conservation officer[s] or other licensed peace officer[s]." Minn. Stat. § 84D.105, subd. 2(c). Those officers can inspect any vessel that is stopped at a water access site, any public location, or even on private property if the vessel is in plain view, but only if the officer has reason to believe AIS is present on the vessel. *Id.* As with inspectors, the conservation and licensed peace officers are authorized to "utilize check stations" near water access points so long as they are "operated in a manner that that minimizes delays to vehicles, equipment, and their occupants." Minn. Stat. § 84D.105, subd. 2(d).

vessel and equipment, such as anchors, that someone has brought to the lake for use there. Such a condition could be imposed by DNR, pursuant to its authority to issue regulations to prevent the introduction of AIS into State waters, *see* NR § 4-205.1(b) and to protect the lake, *see* NR § 5-215.1. If AIS searches are likely to extend to parts of a vessel that are not already subject to inspection under the fishing laws and the State Boat Act, DNR may bolster the legality of such searches by issuing and publicizing regulations that put boat owners on notice of the areas likely to be searched at the boat ramps.

> Brian E. Frosh
> Attorney General of Maryland
>
> Mark C. Talty
> Assistant Attorney General

Adam D. Snyder
Chief Counsel, Opinions & Advice

\* Ann MacNeille, Assistant Attorney General, contributed significantly to the preparation of this opinion.