**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID P. DEMAREST,
*Plaintiff-Appellant*,

v.

CITY OF VALLEJO, California, a
municipality and charter city; JODI
BROWN, Police Officer, as an
individual and in official capacity;
JEFF TAI, Police Officer, as an
individual and in official capacity;
HERMAN ROBINSON, Police Officer,
as an individual and in official
capacity,
*Defendants-Appellees*,

and

JOSEPH KREINS, Former Police
Chief, as an individual and in official
capacity; ANDREW BIDOU, Police
Chief, in official capacity,
*Defendants*.

No. 20-15872

D.C. No.
2:16-cv-02271-
MCE-KJN

OPINION

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., District Judge, Presiding

Argued and Submitted May 13, 2021
San Francisco, California

Filed August 16, 2022

Before:  J. Clifford Wallace, Jacqueline Nguyen, and
Daniel P. Collins, Circuit Judges.

Opinion by Judge Collins

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's summary judgment for defendants in an action brought pursuant to 42 U.S.C. § 1983 alleging that plaintiff's Fourth Amendment rights were violated when he was arrested after declining a police officer's repeated demands to show his driver's license at a sobriety checkpoint and that the officer used excessive force in effectuating the arrest.

Plaintiff alleged that the City of Vallejo violated the Fourth Amendment by adding license checks to what was concededly a sobriety checkpoint. Reviewing a line of relevant Supreme Court decisions, the panel derived a "two-step analysis" for assessing the validity of a checkpoint under the Fourth Amendment. At the first step, a court must determine, in accordance with *City of Indianapolis v.*

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

*Edmond*, 531 U.S. 32, 40 (2000), and *Illinois v. Lidster*, 540 U.S. 419 (2004*), whether a checkpoint is "per se invalid" because its "primary purpose" is "to advance the general interest in crime control" with respect to the occupants of the vehicles being stopped. If the answer to that question is no, then the court must determine the checkpoint's reasonableness, hence, its constitutionality, on the basis of the individual circumstances.

Applying that two-step analysis to this case, the panel first held that because the City's checkpoint did not have any impermissible primary purpose of advancing the general interest in crime control, it was not per se invalid. The panel then applied the factors for assessing reasonableness set forth in *Lidster* and concluded that the City's systematic addition of driver's license checks to an otherwise valid sobriety checkpoint was objectively reasonable under the Fourth Amendment. Given that the Supreme Court has said that removing unlicensed drivers from the road serves a "vital interest" in "highway safety" that would itself justify a traffic checkpoint, a request to produce licenses at an otherwise valid sobriety checkpoint clearly served an equally weighty interest. On this record, the license check interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect and was justified by the important interest in road safety. Therefore, the request that plaintiff produce his license while he was briefly seized at the checkpoint did not entail a Fourth Amendment violation.

The panel held that, once plaintiff refused to produce his license for examination at the checkpoint, Officer Brown had probable cause to believe that plaintiff was committing an offense in violation of California Vehicle Code § 12951(b), and his continued detention and arrest were therefore reasonable under the Fourth Amendment.

Moreover, Officer Brown's action of physically removing plaintiff from his car by grabbing his arm was objectively reasonable as a matter of law given plaintiff's lack of cooperation with her commands up to that point and the modest nature of the force used. Under the relevant circumstances, Officer Brown's use of force in effectuating the arrest was not excessive. Because plaintiff failed to show that he suffered any underlying constitutional violation, his cause of action asserting municipal liability also necessarily failed.

## COUNSEL

David M. Helbraun (argued), Helbraun Law Firm, San Francisco, California, for Plaintiff-Appellant.

Katelyn M. Knight (argued), Assistant City Attorney; Randy J. Risner, Interim City Attorney; Office of the City Attorney, Vallejo, California; for Defendants-Appellees.

Sean Riordan, American Civil Liberties Union Foundation of Northern California, San Francisco, California, for Amicus Curiae American Civil Liberties Union Foundation of Northern California.

**OPINION**

COLLINS, Circuit Judge:

While visiting California from Vermont, David Demarest was asked to produce his driver's license when he pulled up in his rental car to a sobriety checkpoint in the City of Vallejo. Demarest believed that such a request violated his Fourth Amendment rights, and on that express basis he declined an officer's repeated demands to show his license. The officer proceeded to arrest Demarest, although all resulting charges were later dismissed. Demarest then filed this action under 42 U.S.C. § 1983, asserting (as relevant here) that the City and the officer violated the Fourth Amendment by adding license checks to what was concededly a sobriety checkpoint; that Demarest's arrest was not supported by probable cause that he had committed an offense; that the officer had used excessive force in effectuating the arrest; and that the City was liable for these violations of his constitutional rights. The district court granted summary judgment to the City and the officer on all of these claims. We affirm.

**I**

**A**

Because Demarest's appeal challenges an order granting summary judgment to the defendants, we must credit his evidence as true and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Tolan v. Cotton*, 572 U.S. 650, 651 (2014). Applying these standards, we take the following facts as established for purposes of this appeal.

Demarest lived in Vermont and was visiting the west coast in late summer 2014.  During that visit, he purchased a boat in Bellingham, Washington and from there he sailed to the marina in Vallejo.  Due to a staph infection he had developed in his back, Demarest ended up spending a week or two in the Vallejo area, while he visited a "laundry list of healthcare practitioners."  On the evening of Friday, September 26, Demarest, who was driving a rental car, set out from the Vallejo marina with some boating equipment that he planned to deliver to someone in the Oakland area.  As he was driving through Vallejo, Demarest could see some slowing traffic up ahead, but he was initially unsure whether it was construction or some sort of checkpoint.  As he got closer, he saw signs indicating that a "DUI" (*i.e.*, "Driving Under the Influence") and "Driver's License" checkpoint was ahead, but by that point he did not think there was a legal way that he could have turned to avoid it.  Accordingly, he proceeded into the checkpoint at about 7:15 PM.

This particular checkpoint, near the intersection of Sonoma Boulevard and Solano Avenue in Vallejo, had been established pursuant to an advance "DUI Checkpoint Operation Plan."  The location was chosen due to the fact that a significant percentage of "DUI collisions in 2010" had occurred "on or near Sonoma Boulevard."  Under the pre-arranged checkpoint plan, a "neutral formula" was used under which "all vehicles will be stopped unless the backup exceeds 5 minutes," in which case "all vehicles will be waived through until the backup is cleared."  At the checkpoint, which was operated from approximately 6:00 PM until midnight, officers were to "screen drivers for DUI, verify they have a license, and provide educational material in the form of a handout."  To advise drivers of the checkpoint, signs were posted stating, "DUI AND DRIVERS LICENSE CHECKPOINT AHEAD" and

"HAVE YOUR DRIVERS LICENSE READY." In addition to these signs, "the area was coned off"; "traffic [was] slowed and directed to a single lane"; "there was portable lighting in the area"; and "police vehicles were at the checkpoint with [their] emergency lights on." A press release announcing the checkpoint was issued two days in advance and was reported on the website of a local newspaper. Although driver's licenses were to be checked, it is undisputed that (1) the checkpoint's "purpose . . . was to remove intoxicated drivers from the road and to deter intoxicated driving" and (2) "[r]emoving unlicensed drivers from the road and deterring unlicensed driving was *not* a purpose of the [c]heckpoint" (emphasis added).

As Demarest approached the first officer at the checkpoint, that officer signaled to him to proceed forward to the next officer, Jodi Brown. When Demarest reached Officer Brown, he stopped his car, and she asked to see his driver's license. Instead of giving Officer Brown his license, Demarest asked if he could continue on his way. She responded by asking for his driver's license again. He then asked "something to the effect of" whether she had any cause or reasonable suspicion to stop him. Officer Brown ignored the question and told Demarest that, if he did not produce his license, he would be arrested. Demarest did not produce his license. Officer Brown opened the door of his car, grabbed Demarest's left wrist, removed him from the vehicle, and placed a handcuff on his left wrist. While she was doing so, she informed Demarest that he was under arrest, and she admonished him to "stop resisting." The entire process of pulling him out of the car took only about one or two seconds. At his subsequent deposition, Demarest testified that the "whole arrest process" exacerbated his pre-existing back pain by 10 to 25 percent. He did not experience

significant pain in any other part of his body as a result of being pulled out of the car and handcuffed.

After being handcuffed and patted down by Officer Brown, Demarest offered to take a breathalyzer test, but a different officer told him, "[t]hat's not what this is about." Officer Brown turned Demarest over to another officer, Jeff Tai, who then placed him in the back of a police car. After Demarest's Vermont driver's license was located, Officer Tai ran a check on the license and learned that it was valid and that there were no warrants for Demarest's arrest. Demarest asked to speak to a supervisor, and Officer Herman Robinson came to speak with him. Demarest complained to him that he had done nothing wrong and had only exercised his rights under the Fourth Amendment, and Officer Robinson responded with words to the effect of "You win more bees with honey than vinegar."

Demarest was transported to the Vallejo Police Department and booked into jail. During the booking process, Officer Brown noticed a thin rope around Demarest's neck, and she asked what it was. Demarest explained that the rope held a utility knife. The knife was about three inches in length and was encased in a sheath. Demarest explained at his deposition that he kept the knife around his neck so that it would be readily available during sailing. Officer Brown took custody of the knife, and Demarest was then placed in a cell.[1]

Demarest was subsequently charged with two misdemeanors: resisting arrest in violation of California Penal Code § 148(a) and possessing a concealed "dirk or

---

[1] Officer Brown had patted down Demarest his initial arrest at the checkpoint, but she failed to detect the knife at that time.

dagger" in violation of California Penal Code § 21310. Demarest agreed to participate in a diversion program, and upon his successful completion of that program, the charges were dismissed.

## B

Demarest filed this civil action in September 2016. The operative complaint contained ten causes of action and named as Defendants Officers Brown, Tai, and Robinson, in their individual and official capacities, along with the City of Vallejo. However, in rulings that Demarest does not challenge on appeal, the district court dismissed all but the complaint's first cause of action against Officer Brown and its ninth cause of action against the City.[2] Both claims are asserted under 42 U.S.C. § 1983.

The first cause of action asserts that Officer Brown violated Demarest's Fourth Amendment right to be free from unreasonable searches and seizures in three respects. First, it alleges that, by demanding to see Demarest's license at the sobriety checkpoint and refusing Demarest's request to be allowed to proceed, Officer Brown unlawfully detained Demarest without reasonable suspicion or probable cause. Second, it alleges that Officer Brown arrested Demarest without probable cause. Third, it alleges that Officer Brown used excessive force when removing Demarest from his vehicle.

The ninth cause of action alleges that the City is liable for Officer Brown's asserted Fourth Amendment violations under *Monell v. Department of Social Services*, 436 U.S. 658

---

[2] Accordingly, we grant the unopposed motion to dismiss Officers Tai and Robinson as parties to this appeal.

(1978). As to Officer Brown's initial detention of Demarest, the complaint alleges that she acted unlawfully pursuant to the City's alleged official policy of conducting driver's license checks at "DUI checkpoints," even though such checks have "absolutely nothing to do with preventing the dangers" of drunk driving. As for the alleged wrongful arrest and excessive force in effectuating that arrest, the complaint asserts that the City was liable due to its alleged failure "to adequately train, supervise and discipline" officers, including Officer Brown, which Demarest argued had led to a "pattern of officers violating citizens['] civil rights with impunity."

After the parties filed cross-motions for summary judgment, the district court granted summary judgment to Officer Brown and the City in February 2020. The district court rejected Demarest's argument that Officer Brown's demand to see his license rendered his detention at the checkpoint unlawful. The court held that, "although the checkpoint's primary purpose [was] to check for driver sobriety," the officers could properly "require drivers to present a driver's license during the stop because such a requirement does not measurably or unreasonably extend the seizure." Because the seizure and license check were lawful, the district court concluded that Officer Brown had probable cause to arrest Demarest for refusing to produce his license in violation of California Vehicle Code § 12951(b). As to Demarest's claim that Officer Brown used excessive force in making the arrest, the court held that, construing the facts in the light most favorable to Demarest, the force used was reasonable. Because the court thus concluded that Officer Brown had not committed the alleged constitutional violations, it did not address the issue of qualified immunity or the additional issues concerning the City's potential liability under *Monell*.

Demarest timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291.  We review the district court's summary judgment de novo.  *See Sandoval v. County of Sonoma*, 912 F.3d 509, 515 (9th Cir. 2018).

## II

The Fourth Amendment, which is applicable to the States through the Fourteenth Amendment, protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  An automobile that has been stopped by government officials at a checkpoint has been seized for Fourth Amendment purposes, and any such seizure therefore must comport with that amendment's requirements. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000).  As a general matter, "searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (citations and internal quotation marks omitted).  In a series of decisions, the Supreme Court has recognized one such limited exception for certain carefully circumscribed vehicle checkpoints. *See Edmond*, 531 U.S. at 47 (reaffirming past decisions recognizing the constitutionality of limited "sobriety and border checkpoints" and suggesting that certain "traffic checkpoint[s]" to check licenses and registration would likewise be constitutional).  The central question in this appeal is whether the City's checkpoint falls within the exception recognized in those decisions.  We conclude that it does.

## A

In addressing whether the City's vehicle checkpoint fits within that exception, we begin by carefully reviewing the reasoning and holdings of the Supreme Court's relevant decisions.

In the seminal case of *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), the Court upheld the constitutionality of vehicle stops made without warrants or reasonable suspicion at "permanent immigration checkpoint[s]" on major highways heading away from the border.  428 U.S. at 545.    Although "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure," *id*. at 560, the Court held that a "balancing [of] the interests at stake" confirmed that it was reasonable, and consistent with the Fourth Amendment, to make the limited "stops and questioning at issue . . . at reasonably located checkpoints," notwithstanding "the absence of any individualized suspicion" or a warrant.  *Id*. at 556, 562; *see also id*. at 562 n.15.  Noting that "one's expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence," *id*. at 561, the Court held that immigration-enforcement interests served by the "routine checkpoint stops" were "great" and outweighed the "quite limited" intrusion on "motorists' right[s]," *id*. at 557.  The Court emphasized that "the reasonableness of the procedures followed in making these checkpoint stops" made "the resulting intrusion on the interests of motorists minimal."  *Id*. at 562.

Thereafter, in *Delaware v. Prouse*, 440 U.S. 648 (1979), the Court distinguished *Martinez-Fuerte* in holding that a roving patrol—in which an officer, without any reasonable suspicion, pulled over a particular vehicle in order to check

the driver's license and the vehicle's registration—violated the Fourth Amendment. 440 U.S. at 663. As the Court explained, there was a "crucial distinction" between the sort of "roving-patrol stop" or "spot check[]" at issue in *Prouse* and the fixed checkpoint in *Martinez-Fuerte*. *Id*. at 656–57. Although the level of "objective intrusion—the stop itself, the questioning, and the visual inspection"—might be comparable in the two situations, the level of "*subjective* intrusion —the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop." *Id*. at 656 (quoting *Martinez-Fuerte*, 428 U.S. at 558) (emphasis added); *see also id*. at 657 ("At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." (quoting *United States v. Ortiz*, 422 U.S. 891, 894–95 (1975))). Moreover, unlike the checkpoint in *Martinez-Fuerte*, the sort of roving-patrol stop in *Prouse* involved an exercise of "standardless and unconstrained discretion." *Id*. at 661. In light of these substantially greater intrusions on Fourth Amendment interests, the arbitrary stopping of specific vehicles could not be justified by whatever "marginal contribution to roadway safety" such stops might entail. *Id*.

The *Prouse* Court cautioned, however, that its "holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion." *Id*. at 663. In particular, the Court underscored that "[q]uestioning of all oncoming traffic at roadblock-type stops is one possible alternative." *Id*. Indeed, the Court has subsequently characterized its decision in *Prouse* as having "approved vehicle checkpoints set up for the purpose of

keeping off the road unlicensed drivers." *Ashcroft v. al-Kidd*, 563 U.S. 731, 737 (2011).

The Court in *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990), subsequently addressed the constitutionality of a *sobriety* checkpoint, which the Court held was more like the immigration checkpoints in *Martinez-Fuerte* than the roving license-check in *Prouse*. *See Sitz*, 496 U.S. at 454–55. Just as with the immigration checkpoints in *Martinez-Fuerte*, the "intrusion on motorists stopped briefly at sobriety checkpoints . . . is slight." *Id*. at 451. Indeed, the Court saw "virtually no difference between the levels of intrusion on law-abiding motorists from the brief stops necessary to the effectuation of these two types of checkpoints, which to the average motorist would seem identical save for the nature of the questions the checkpoint officers might ask." *Id*. at 451–52. Because the "preliminary questioning and observation" at the checkpoint was brief and limited, the extent of the intrusion was "minimal" and was outweighed by the "magnitude of the drunken driving problem [and] the States' interest in eradicating it." *Id*. at 450–52. Moreover, the checkpoint's operation was governed by guidelines, issued by a state advisory committee, that "minimize[d] the discretion of the officers on the scene" and eliminated the "kind of standardless and unconstrained discretion" that had troubled the Court in *Prouse*. *Id*. at 452, 454 (citation omitted).

In *Edmond*, the Court distinguished its earlier cases and held that the Fourth Amendment prohibited an Indianapolis "highway checkpoint program whose primary purpose [was] the discovery and interdiction of illegal narcotics." 531 U.S. at 34. As *Edmond* noted, the prior checkpoint programs the Court had approved were "designed primarily to serve purposes closely related to the problems of *policing the*

*border* or the necessity of *ensuring roadway safety*." *Id*. at 41 (emphasis added). The Court had never approved a checkpoint outside those limited contexts and it "decline[d] to suspend the usual requirement of individualized suspicion" where—as in the Indianapolis checkpoint program in *Edmond*—"the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes." *Id*. at 44. The Court recognized that the border and roadway-safety contexts could also be said, like the Indianapolis checkpoint, to involve "law enforcement activities." *Id*. at 42. But the Court concluded that, if its prior cases were read at such a "high level of generality" as authorizing checkpoints for *any* law enforcement purpose, then "there would be little check on the ability of the authorities to construct roadblocks," which would then "becom[e] a routine part of American life." *Id*. "Because the *primary purpose* of the Indianapolis checkpoint program [was] ultimately indistinguishable from the general interest in crime control, the checkpoints violate[d] the Fourth Amendment." *Id*. at 48 (emphasis added); *see also id*. at 47 (stating that, under the Court's subjective test, "a program driven by an impermissible purpose may be proscribed while a program impelled by licit purposes is permitted, even though the challenged conduct may be outwardly similar").

The *Edmond* Court acknowledged that Fourth Amendment standards are usually objective and do *not* consider the subjective motivations of the governmental actors. *See id*. at 45; *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019) (stating that, "[i]n the Fourth Amendment context," the Court has "'almost uniformly rejected invitations to probe subjective intent'" (citation omitted)). But the Court distinguished between the typical Fourth Amendment context, which involves individualized

determinations of suspicion, and the checkpoint situation, which does not. "[P]rogrammatic purposes," the Court stated, "may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to *a general scheme without individualized suspicion*." *Edmond*, 531 U.S. at 45–46 (emphasis added).

In a subsequent case, however, the Supreme Court confirmed that, outside certain limited contexts, such as the sort of "warrantless, 'suspicionless intrusions pursuant to a general scheme'" at issue in *Edmond*, the Court continues to employ a standard of "*objective* reasonableness," rather than to undertake "subjective inquiries." *al-Kidd*, 563 U.S. at 738–39 (emphasis added) (citation omitted). In support of this proposition, the Court cited *Bond v. United States*, 529 U.S. 334 (2000), which applied an objective standard in judging the Fourth Amendment reasonableness of a border patrol agent's conduct in squeezing, "in an exploratory manner," the defendant's soft-sided luggage, which was located in the overhead storage space of a bus that had been stopped at an immigration checkpoint. 529 U.S. at 335, 339. As the *Bond* Court explained, the officer's "subjective intent" was "irrelevant"; what mattered, under the Fourth Amendment, was "not his state of mind, but the objective effect of his actions." *Id*. at 338 n.2. Applying that objective standard, the Court held that the suspicionless tactile examination of the luggage infringed the defendant's reasonable expectation of privacy and was therefore unreasonable under the Fourth Amendment. *Id*. at 338–39 & n.2.

Lastly, in *Illinois v. Lidster*, 540 U.S. 419 (2004), the Court further clarified and limited the reach of *Edmond*. In *Lidster*, approximately one week after a late-night hit-and-run accident in which a bicyclist had been killed, the police

set up a checkpoint "at about the same time of night and at about the same place." *Id*. at 422. The expectation was "that motorists routinely leaving work after night shifts at nearby industrial complexes might have seen something relevant," and so the police "stopped all vehicles systematically," handed drivers a flyer about the accident, and asked them if they had any information about it. *Id*. at 427–28. The Illinois Supreme Court held that, because the checkpoint's primary purpose was law enforcement, it was unconstitutional under *Edmond*, but the U.S. Supreme Court disagreed. *Id*. at 423. *Edmond* involved a stop in which the "primary law enforcement purpose" was "to determine whether a vehicle's *occupants* were committing a crime," whereas the primary purpose of the checkpoint in *Lidster* was "to ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed *by others*." *Id*. (emphasis added). An "*Edmond*-type rule of automatic unconstitutionality" does not apply to such "brief, information-seeking highway stops." *Id*. at 424. As the Court explained, *Edmond*'s rule rests on the concern about using checkpoints for the primary purpose of generalized law enforcement against motorists as to whom there is no individualized suspicion, but that rationale did not apply to the information-seeking checkpoint in *Lidster*, where, "by definition, the concept of individualized suspicion has little role to play." *Id*.

Because *Edmond*'s automatic rule did not apply, *Lidster* assessed the reasonableness of the checkpoint "on the basis of the individual circumstances." *Id*. at 426. Among the factors to be considered "in judging reasonableness," the Court stated, are "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id*. at 427 (citation omitted). After

considering these factors, the Court held that "the checkpoint stop was constitutional." *Id*. at 428.

**B**

In reviewing this line of Supreme Court cases, we have derived from them a "two-step analysis" for assessing the validity of a checkpoint under the Fourth Amendment. *United States v. Fraire*, 575 F.3d 929, 932 (9th Cir. 2009). At the first step, a court must determine, in accordance with *Edmond* and *Lidster*, whether a checkpoint is "per se invalid" because its "primary purpose" is "to advance the general interest in crime control" with respect to the occupants of the vehicles being stopped. *Id*. (citation and internal quotation marks omitted). If the answer to that question is no, then the court must "determine its 'reasonableness, hence, its constitutionality, on the basis of the individual circumstances.'" *Id*. at 933 (quoting *Lidster*, 540 U.S. at 426). We turn, then, to applying that two-step analysis to this case.

**1**

The undisputed facts confirm that the City's checkpoint did not involve an impermissible primary programmatic purpose of "uncover[ing] evidence of ordinary criminal wrongdoing." *See Edmond*, 531 U.S. at 41–42. In connection with their summary judgment motions, the parties expressly agreed that "[t]he purpose of the [c]heckpoint was to remove intoxicated drivers from the road and to deter intoxicated driving." Under *Edmond* and *Sitz*, this primary purpose of "ensuring roadway safety" by "reducing the immediate hazard posed by the presence of drunk drivers on the highways" is a permissible basis for conducting a checkpoint and is materially distinguishable from the impermissible primary purpose of "serv[ing] the

general interest in crime control." *Edmond*, 531 U.S. at 39, 41–42; *see also Sitz*, 496 U.S. at 451. Demarest does not contend otherwise in this court.

The parties also stipulated below that "[r]emoving unlicensed drivers from the road and deterring unlicensed driving was *not* a purpose of the [c]heckpoint" (emphasis added). This stipulation, which addresses only what was *not* a purpose of the checkpoint, does not in any way detract from the parties' agreement that the checkpoint had a permissible primary purpose. Moreover, even if removing unlicensed drivers from the road *had* been a primary purpose of the checkpoint, that would not have rendered it "per se invalid" under *Edmond*. *See Fraire*, 575 F.3d at 932. As *Edmond* makes clear, a "roadblock with the [primary] purpose of verifying drivers' licenses and vehicle registrations would be permissible" because it rests on a purpose of ensuring "highway safety" rather than general crime control. 531 U.S. at 38–39; *see also al-Kidd*, 563 U.S. at 737; *Prouse*, 440 U.S. at 663.

Because the City's checkpoint did not have any impermissible primary purpose of advancing the general interest in crime control, we conclude that it was not "per se invalid" under the first step of our analysis. *Fraire*, 575 F.3d at 932.

**2**

Having determined that the City's checkpoint was not one established primarily for general crime control, we proceed to the second step of the analysis, at which we must assess the reasonableness of the checkpoint "on the basis of the individual circumstances." *Lidster*, 540 U.S. at 426. In addressing the checkpoint seizure at issue here, we differentiate between two aspects of that seizure—namely,

the initial checkpoint stop itself, and the prolongation of that seizure caused by the demand to see each motorist's driver's license.

On appeal, Demarest does *not* dispute that the initial stop of his vehicle was properly made pursuant to a DUI checkpoint that was constitutionally permissible under *Sitz*. Nor could he. *Sitz* held that state and local governments have a strong interest in removing drunk drivers from the road; that properly limited checkpoints "can reasonably be said to advance that interest"; and that the "measure of the intrusion on motorists stopped briefly" at prominently marked checkpoints "is slight." 496 U.S. at 451, 455. At least with respect to the initial stopping of vehicles at the City's checkpoint, each of these holdings is likewise applicable here.[3] Moreover, as in *Sitz*, the City's checkpoint was planned and conducted pursuant to objective guidelines that "minimize[d] the discretion of the officers on the scene" and eliminated the "kind of standardless and unconstrained discretion" that might give rise to constitutional concerns. *Id*. at 452, 454 (citation omitted). We therefore agree that the initial stop of Demarest's vehicle at the DUI checkpoint was consistent with the Fourth Amendment.

The next question is whether that initially valid seizure was rendered unreasonable because the City systematically added a license check to a DUI checkpoint. Demarest argues that this addition improperly prolonged the seizure and thereby rendered it unreasonable. Specifically, Demarest

---

[3] As stated earlier, the City selected the location for the stop because it had been associated in the past with a significant number of "DUI collisions," and at least two signs alerted drivers to the nature of the upcoming checkpoint, which was clearly marked off with cones and lights. *See supra* at 6–7.

contends that, in evaluating two of the factors that *Lidster* instructs us to consider in assessing the reasonableness of a checkpoint seizure—namely, the importance of the "public concerns served" by the checkpoint and the extent to which the checkpoint "advances the public interest"—we are limited to considering *only* the public interest in removing drunk drivers from the road and *not* the interest in intercepting unlicensed drivers.   540 U.S. at 426–27 (citations omitted).   According to Demarest, because the parties stipulated that intercepting unlicensed drivers was not one of the subjective purposes of this particular checkpoint, that public interest may not be considered in assessing the checkpoint's reasonableness.   Instead, Demarest argues, our analysis must be limited to assessing whether the severity of the intrusions on his liberty at the checkpoint—including the demand to see driver's licenses—is justified by the extent to which those intrusions advance important interests in preventing *drunk driving*. And because demanding to see the license of the obviously sober Demarest did not further that interest, he argues, the nature and extent of his seizure at the checkpoint was unreasonable.   We reject this argument, which rests on a misunderstanding of the relevant Fourth Amendment principles.

In construing the Fourth Amendment's prohibition against "unreasonable" searches and seizures, *see* U.S. CONST. amend IV, the Supreme Court has "almost uniformly rejected invitations to probe subjective intent" and has instead held that "[l]egal tests based on reasonableness are generally *objective*."   *Nieves*, 139 S. Ct. at 1724–25 (emphasis added) (citations omitted).  As explained earlier, *Edmond* recognized a limited departure from this insistence on objective standards of reasonableness when it held that a "general scheme" of "suspicionless intrusions" that is

"*driven by an impermissible [subjective] purpose*" is per se unreasonable.  531 U.S. at 47 (emphasis added); *see supra* at 14–16.  In a footnote, the Court left open the question of whether a checkpoint with a "*secondary* purpose" of general crime control would likewise be invalid.  *Id*. at 47 n.2 (emphasis added).  But the *Edmond* Court did not otherwise retreat from the general proposition that "reasonableness under the Fourth Amendment is predominantly an objective inquiry."  *Id*. at 47; *see also al-Kidd*, 563 U.S. at 736–37 (stating that, outside the context of *Edmond* and a few other "limited exceptions," the Court has "almost uniformly rejected invitations to probe subjective intent" (simplified)).

This case involves a checkpoint that, as we have explained, manifestly does not involve an impermissible primary (or even secondary) subjective purpose.  *See supra* at 18–19.  Indeed, even if the checkpoint here had been subjectively motivated in part by a desire to remove unlicensed drivers from the road, that subjective purpose would *not* be an invalid one under *Edmond*.  As a result, *Edmond*'s limited exception to the normal rule against consideration of subjective purpose has fulfilled its task of screening out *impermissible* subjective purposes—here, there are none.  Because the *Edmond* exception does not apply, the remaining inquiry into the reasonableness of the checkpoint's intrusion is an objective one.  Consequently, that reasonableness analysis may take account of any interest that *Edmond* classifies as a proper basis for conducting a checkpoint in the first place.  In other words, because the interests in detecting drunk drivers and unlicensed drivers are both permissible *primary* purposes for conducting a checkpoint, there is no logical reason why either of these legitimate interests should be set aside in assessing the objective reasonableness of what, under *Edmond*, is

unquestionably a *properly motivated* checkpoint program.[4] Accordingly, even though detecting unlicensed drivers was not the subjective purpose of this particular checkpoint, the public interest in such detection may nonetheless be considered in assessing the checkpoint's objective reasonableness.

Turning to the factors for assessing reasonableness set forth in *Lidster*, we conclude that the City's systematic addition of driver's license checks to an otherwise valid DUI checkpoint was objectively reasonable under the Fourth Amendment.  As noted earlier, *Lidster* tells us to consider "[1] the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty."  540 U.S. at 427 (citation omitted).  The first two factors weigh in favor of the objective reasonableness of the City's license checks at its DUI checkpoint.  Given that the Court has said that removing unlicensed drivers from the road serves a "vital interest" in "highway safety" that would *itself* justify a traffic checkpoint, *see Edmond*, 531 U.S. at 39 (citations omitted), a request to produce licenses at an otherwise valid DUI checkpoint clearly serves an equally weighty interest.  Moreover, it is obvious that such license checks are "appropriately tailored," *Lidster*, 540 U.S. at 427, to advancing this "interest in ensuring that only those qualified to do so are permitted to operate motor vehicles," *Prouse*, 440 U.S. at 658; *see also Edmond*, 531 U.S. at 41 (stating

---

[4] We would be presented with a very different case if the City had sought to defend the reasonableness of the checkpoint based on an interest that—unlike the interception of unlicensed drivers—could *not* serve as a permissible primary programmatic purpose of a checkpoint.

that license checks "serve purposes closely related to . . . the necessity of ensuring roadway safety").

The remaining *Lidster* factor requires us to consider the severity of the marginal intrusion on liberty associated with the City's addition of a driver's license check to this DUI checkpoint. We conclude that, on this record, the license check "interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect." *Lidster*, 540 U.S. at 427. In reaching this conclusion, we emphasize three considerations.

First, as *Edmond* makes clear, a license check, by itself, does not entail "the ordinary enterprise of investigating crimes." 531 U.S. at 44. Without more, license checks are not the sort of inquiry that, when undertaken at a checkpoint, might be thought to require some measure of individual suspicion. *Cf. Sitz*, 496 U.S. at 451 (noting that "[d]etention of particular motorists for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard" (citing *Martinez-Fuerte*, 428 U.S. at 567)). The non-law-enforcement nature of the license checks in this case is especially clear, because the City concededly did *not* use the license checks to conduct on-the-spot warrant checks. *Cf. United States v. Bernacet*, 724 F.3d 269, 271, 273–74 (2d Cir. 2013) (addressing a license checkpoint in which officers ran licenses through multiple databases, including a "criminal history database"). The mere request to produce a facially valid license is a relatively modest additional intrusion on the liberty of a motorist who has already been properly stopped at a checkpoint.

Second, the license checks' contribution to the length of the checkpoint stops is marginal, if not de minimis. It was undisputed below that, unless a motorist was referred for further screening, the City's "Operation Plan" for

conducting the checkpoint contemplated that the entire duration of each seizure, *including* the license check, would be only 15 seconds. That is well within the range of very brief detentions that the Supreme Court has upheld as reasonable at vehicle checkpoints. *See Lidster*, 540 U.S. at 427 (holding that information-seeking checkpoint stops lasting "a very few minutes at most" were reasonable); *Sitz*, 496 U.S. at 448 (holding that DUI checkpoint stops were reasonable where the "average delay for each vehicle was approximately 25 seconds"). To be sure, the duration of *Demarest's* seizure was much longer, but that is attributable to his refusal to produce his driver's license, which (as we explain below) was a violation of California law that *then* independently justified a further detention. *See infra* at 26–28. As the Supreme Court stated in *Sitz*, the reasonableness of the intrusion on liberty at a checkpoint is assessed by considering the "levels of intrusion on *law-abiding* motorists." 496 U.S. at 451–52 (emphasis added).

Third, the City's checkpoint contained sufficient programmatic guidelines to "minimize the discretion of the officers on the scene." *Id*. at 452. It was undisputed below that, under the City's Operation Plan, *every* motorist at the checkpoint would be asked to produce a driver's license.[5] The across-the-board nature of that inquiry eliminates any possible "abuse of discretion" in selectively making such requests only to some drivers. *Prouse*, 440 U.S. at 662.

On balance, any marginal intrusion on liberty associated with adding license checks to the City's DUI checkpoint is minimal and is justified by the important interest in road

---

[5] Every driver was stopped "unless the backup exceed[ed] 5 minutes." In the event of such a backup, "all vehicles [would] be waived through until the backup [was] cleared."

safety served by such inquiries.  We therefore conclude that the request that Demarest produce his license while he was briefly seized at the checkpoint did not entail a Fourth Amendment violation.[6]  The district court properly granted summary judgment against Demarest on this score.

## III

Demarest also contends that, even if the inclusion of a license check did not render the City's DUI checkpoint unreasonable under the Fourth Amendment, Officer Brown nonetheless violated the Fourth Amendment by detaining him further, and ultimately arresting him, when he refused to produce his driver's license.  A warrantless arrest is reasonable under the Fourth Amendment "if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018).  "Because the probable cause standard is objective, probable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect for any criminal offense, regardless of their stated reason for the arrest." *Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 954 (9th Cir. 2010) (citation omitted).  We conclude that, once Demarest refused to produce his license for examination at the checkpoint, Officer Brown had probable cause to believe that Demarest was committing an offense in violation of California Vehicle

---

[6] We therefore do not address or rely upon the City's alternative argument that an officer at a suspicionless checkpoint should be permitted to make the same "ordinary inquiries" that are "incident" to a traffic stop justified by individualized suspicion. *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)).

Code § 12951(b), and his continued detention and arrest were therefore reasonable under the Fourth Amendment.

Section 12951(b) states that "[t]he driver of a motor vehicle shall present his or her license for examination upon demand of a peace officer enforcing the provisions of this code." The California Vehicle Code further provides that, "[e]xcept as otherwise provided in this article, it is unlawful and constitutes an infraction for any person to violate, or fail to comply with any provision of this code, or any local ordinance adopted pursuant to this code." CAL. VEH. CODE § 40000.1. Another provision of the same article as § 40000.1 states that a "violation" of "Section 12951, subdivision (b), relating to refusal to display license" "is a misdemeanor, and not an infraction." *Id*. § 40000.11(i). Accordingly, it is a misdemeanor under California law to refuse to produce one's driver's license for examination "upon demand of a peace officer enforcing the provisions of this code." *Id*. § 12951(b).

Here, of course, it is undisputed that Demarest refused to produce his license in response to Officer Brown's demands to see it. Demarest nonetheless argues that Officer Brown lacked probable cause to suspect that he was violating § 12951(b) because, at the time when she demanded to see Demarest's license, she had no basis to believe that she was "enforcing the provisions" of the Vehicle Code. According to Demarest, for Officer Brown to have been "enforcing the provisions" of the Vehicle Code when she demanded to see his license, she must have been enforcing some *other* provision of the Code that justified the stop leading to the license demand. In Demarest's view that means she must have made a "valid stop based upon reasonable suspicion" of some other Vehicle Code violation. This argument fails. At the time that Officer Brown demanded to see Demarest's

license, she was enforcing the provision of the Vehicle Code that specifically authorizes the conduct of a "sobriety checkpoint inspection."    CAL. VEH. CODE § 2814.2(a). Under that provision, a "driver of a motor vehicle shall stop and submit to a sobriety checkpoint inspection conducted by a law enforcement agency when signs and displays are posted requiring that stop." *Id*.  An officer who stops a motorist at a lawful sobriety checkpoint is thus enforcing the provisions of the Vehicle Code every bit as much as an officer who stops a motorist based on individualized reasonable suspicion of a Code violation, and § 12951(b) applies equally in both situations.[7]

Because Officer Brown had probable cause to conclude that Demarest's refusal to produce his driver's license violated § 12951(b), her detention and arrest of him did not violate the Fourth Amendment.[8]  Summary judgment was properly granted against Demarest as to this claim as well.

## IV

Lastly, Demarest asserts that he presented sufficient evidence to establish that Officer Brown violated the Fourth

---

[7] On its face, the text of § 2814.2 also contemplates that the "sobriety checkpoint inspection[s]" that it authorizes will include license checks, because it contains detailed provisions relating to the impoundment of vehicles when the checkpoint reveals that the driver lacks a valid license. *See* CAL. VEH. CODE § 2814.2(b), (c).

[8] For purposes of Demarest's § 1983 claims, it is irrelevant whether California law authorized an arrest for a violation of § 12951(b).  *See Virginia v. Moore*, 553 U.S. 164, 176 (2008) (holding that "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections").

Amendment by using excessive force in effectuating his arrest.  We reject this contention.

Any claim that an officer used excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen" is governed by the Fourth Amendment's standard of objective reasonableness.  *See Graham v. Connor*, 490 U.S. 386, 395–97 (1989).  In judging the reasonableness of the force used, the trier of fact should consider all relevant circumstances, such as the following illustrative but non-exhaustive factors: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  Summary judgment is appropriate "if the . . . court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).  Applying these standards, we conclude that the force that Officer Brown used was objectively reasonable as a matter of law.

The Supreme Court has "long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Accordingly, even assuming that Demarest did not actively resist and did not present an immediate security threat to Officer Brown, she nonetheless could properly use a reasonable degree of force to take him into custody. Although Demarest argues that Officer Brown should have instructed him to step out of the car rather than physically

remove him from the car by grabbing his arm, her actions were reasonable given Demarest's lack of cooperation with her commands up to that point and the modest nature of the force used. *See Lowry v. City of San Diego*, 858 F.3d 1248, 1259 (9th Cir. 2017) (explaining that "officers are not required to use the least intrusive degree of force possible" (citations and internal quotation marks omitted)); *see also Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) ("It [i]s not unreasonable for [an] officer[] to believe that a suspect who had already disobeyed one direct order would balk at being arrested.").

Demarest nonetheless claims that the force was unreasonable because it aggravated his existing back injury, but he presented no evidence to support a reasonable inference that Officer Brown should have been aware that he had such an injury. On the contrary, Demarest stated at his deposition that, during his arrest, he "was afraid to mention anything about my back." Because an "officer's use of force cannot be deemed excessive based on facts that he [or she] reasonably would not have known or anticipated," *Lowry*, 858 F.3d at 1256, any such aggravation of Demarest's back condition does not render Officer Brown's force excessive.

Demarest also asserts that the handcuffs could have been applied "with a lot less force on my wrists," but he did not present any evidence suggesting that the handcuffs were excessively tight or that they caused any injury. Indeed, Demarest stated at his deposition that, although he had abrasions on his hands, they were from his earlier boat work and not from the handcuffing. Demarest failed to present any evidence to suggest that the handcuffing was carried out in a constitutionally unreasonable manner. *See Brown*, 278 F.3d at 369 ("[A] standard procedure such as handcuffing would rarely constitute excessive force where

the officers were justified . . . in effecting the underlying arrest.").

Construing the facts in the light most favorable to Demarest, we conclude that, under the relevant circumstances, Officer Brown's use of force in effectuating the arrest was not excessive.

## V

Because Demarest has failed to show that he suffered any underlying constitutional violation, Demarest's ninth cause of action, asserting municipal liability for such violations, necessarily fails. *See Monell*, 436 U.S. at 691; *see also Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

\*      \*      \*

For the foregoing reasons, we affirm the district court's grant of summary judgment dismissing Demarest's claims.

**AFFIRMED.**